MARILYN Kelly, J.
This case presents the question whether newly discovered impeachment evidence can constitute grounds for a new trial and, if so, under what circumstances. Defendant seeks a retrial on the basis of the newly discovered impeachment evidence. The trial court and the Court of Appeals concluded that this evidence cannot be used as a basis for granting a new trial because, in part, it is impeachment evidence. The Court of Appeals also concluded that the evidence did not warrant a new trial because if it were admitted on retrial, there was no reasonable chance of a different result.
We hold that impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth *300 in People v Cress.[1] We further hold that a material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial. It may be of a general character and need not contradict specific testimony at trial. Also, the evidence must make a different result probable on retrial. Accordingly, we vacate the Court of Appeals’ judgment and remand this case to the trial court for determination of whether the newly discovered evidence satisfies Cress.
I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
A. THE COMPLAINANT’S STORY AND DEFENDANT’S CONVICTIONS
This case involves an alleged rape that occurred in 2001. The complainant testified that on May 12, 2001, she drove her van into the parking lot of the Fort Gratiot Meijer store between noon and 12:30 p.m. She claimed that she stepped out and turned to retrieve her purse from between the front seats. While she did so, a man with long dirty hair, a scraggly beard, and a hat appeared in front of the open door. He grabbed her arm and ordered her into the van. She testified that she resisted him, but the man struck her, causing her to fall inside. She continued to resist, but after being struck again, briefly lost consciousness.
When she regained her senses, her head was between the front seats, one of her legs was pinned by the man, and the other was pinned by the steering wheel. The man unbuttoned her pants and pulled them and her underwear down around her knees. He then unzipped his own pants and she saw his erect penis. The man again struck her several times with his hand and stated, “This will shut you up.” He slid a ring with several *301 stones on it down one of his fingers to the knuckle and, she testified, forced that finger into her vagina.
The complainant claimed that she attempted to scream but could not because, after the man struck her, she was having difficulty breathing. However, she was able to call the man a “bastard” and he responded by backhanding her. The complainant indicated that she could taste blood from a cut on her face. She claimed that the man then inserted his penis into her vagina while gripping and striking her thighs as she continued to resist. The complainant testified that she again lost consciousness, but when she revived, her attacker was gone. She claimed that she found her way home, but was unable to recall the details of how she got there. When she arrived home, she immediately went into her bedroom because she did not want her children to know what had happened.
The complainant’s husband testified that he knew that something was wrong when she returned home. He claimed that the complainant looked panicked and had a cut on her mouth. He questioned her about what had happened, and the complainant indicated in an incoherent and rambling manner that she had been physically attacked. However, she did not mention having been sexually assaulted. She testified that she did not tell her husband about the sexual assault because she “wasn’t ready to face [her]self” and “didn’t know how to break [her husband’s] heart.” The complainant’s husband testified that he noticed large bruises developing on her legs and arms over the days following the attack.
On May 14, 2001, two days following the attack, the complainant reported the assault to the police. Again, she did not report its sexual nature and the police treated the incident as an attempted carjacking. However, the police did note a large scratch on the complain *302 ant’s face and that she told them she had extensive bruising. The complainant testified that she did not report the extent of the attack to the police because she had not yet fully disclosed the details of the assault to her husband.
Also on May 14, 2001, the complainant received medical treatment from Dr. Paul Jerry for some of her injuries. Jerry testified that he observed that the complainant’s arm was swollen and bruised and that she reported tenderness in her neck. She testified that she did not report the sexual assault to Jerry because she was uncomfortable talking to him near other beds. She said she did not think reporting it would be helpful given that she had since showered.
On May 15, 2001, the complainant told someone for the first time that she had been sexually assaulted. The friend she spoke to described her as traumatized and advised her to disclose the sexual nature of the assault to her husband. The complainant thereafter told her husband that she had been digitally penetrated. However, she claimed that she did not disclose further details because of his reaction.
On May 16, 2001, the complainant was seen by Dr. Deborah Russell, her gynecologist. She reported the full account of the attack, including the penile penetration. She explained that because her attacker had not worn a condom, she was concerned about possible health-related issues. Russell directed the complainant to return to the hospital emergency room because doctors there would be better able to treat her for a sexual assault.
On Russell’s advice, the complainant returned to the hospital along with her husband. She was treated by Dr. Thabit Bahhur. Because her husband was present and she had not yet told him the nature of the assault, she told *303 Bahhur only that she had been digitally penetrated. Bahhur observed abrasions on the outside and inside of the complainant’s vagina, as well as on her cervix. He testified that the abrasions were consistent with forceful digital or penile penetration but he could not rule out other causes of the injuries. He did not collect evidence for a “rape kit” because of how much time had elapsed since the alleged attack. Also, the complainant had changed clothes and reported only a digital penetration. Additionally, the complainant had thrown away all the clothing she had worn during the alleged assault before it could be tested. She admitted that she knew at the time that it could have been tested for DNA evidence.
One week later, on May 23, 2001, the complainant returned to Russell for a follow-up examination that revealed bruising on her legs and arm, as well as abrasions along her inner labia. Russell opined that the complainant’s vaginal area was normal at the time, but noted that the “vaginal area heals very quickly,” so any abrasions more than a few days old would have healed.
Several months elapsed before the complainant told her husband the full account of her alleged assault.
Thirteen months after the alleged rape, in June 2002, the complainant reported to the police that she was driving near the Fort Gratiot Meijer when she saw a black Jeep leave a driveway. While it was behind her stopped at a traffic light, she said that she recognized the person she believed to be her assailant in her rearview mirror. She indicated that the driver had scraggly hair, a beard, and a ring on his hand. It was then that she notified the police for the first time that she had been sexually assaulted. She did this, she claimed, because she did not want to live in fear and believed that she might be able to “get the person off the street who hurt [her] . . . .”
*304 Over a five-day period in October 2002, the complainant reviewed more than 7,500 photographs at the police station. She identified her attacker in one picture. That person was defendant. Sometime afterward, police officers interviewed defendant. He initially denied owning a ring like the one described by the complainant, although he later admitted that he had owned such a ring but had pawned it.
On November 7, 2002, the police arranged a corporeal lineup at which the complainant was given an opportunity to identify her assailant. Police officers advised defendant at his home that he should be at the station at a certain time. When they did so, defendant looked unkempt, with long hair and a scraggly beard. But when he arrived for the lineup, he had shaved his head and face. The complainant did not identify defendant as her attacker, instead selecting a different person from the lineup. Nonetheless, defendant was charged with two counts of criminal sexual conduct involving the use of force or coercion and resulting in personal injury to the victim.[2]
Several months before trial, the complainant claimed to have remembered that her attacker had a skull tattoo on his upper arm, although she did not recall any other details about it. Nor had she recalled the tattoo when the lineup was held or on any other occasion. Trial testimony established that defendant had a skull tattoo on his upper arm. There was also testimony that defendant had worked at the Fort Gratiot Meijer store on the day of the assault.
A St. Clair County deputy sheriff testified that the police never made a connection between defendant and a Jeep-type vehicle that the complainant asserted she *305 had seen him driving. Furthermore, testimony established that defendant had pawned a ring in May 2001. That was more than a year before the victim reported seeing a man in a black Jeep wearing a ring that she claimed she could positively identify.
Defendant did not testify at trial. A jury convicted him as charged of two counts of first-degree criminal sexual conduct. He was sentenced to 15 to 35 years in prison. On direct appeal, the Court of Appeals affirmed his convictions.[3] We denied his application for leave to appeal.[4]
B. THE NEWLY DISCOVERED EVIDENCE
Two years after defendant’s convictions, the complainant called one of the detectives who had investigated the case against defendant. She informed him that she had been sexually assaulted by her brother and her father when she was a child. Another officer spoke with the complainant, who then reported having been raped in California. The prosecutor then obtained police reports from Bakersfield and Fresno, California, and provided them to defendant.
1. THE BAKERSFIELD, CALIFORNIA POLICE REPORTS
The first report, dated September 28, 2001, included a missing-persons form that the complainant’s mother had filed with the Bakersfield police. The form indicated that the complainant had been having lunch at a restaurant with her mother and a friend when her cellular telephone rang. She left the restaurant with her phone but never returned. According to the officer who *306 completed the form, L. Lerman, the complainant’s mother said that it was “ ‘out of character’ ” for the complainant to “just take off.” She also told the police that the complainant had been raped several months earlier and since then had “not been herself.”
The report also included a claim that the Bakersfield police received from the complainant’s father the following day. Her father indicated that the complainant had recently called him and “told him she had been kidnaped and he needed to call the police.” The police went to the father’s house and asked him if he believed his daughter. He replied: “ ‘No. I’m afraid it’s just a smoke screen. My daughter likes to have a lot of attention.’ ” The father also told the police that the complainant had been sexually assaulted between the ages of 10 and 12 by a female member of their church congregation. He further stated that “the police were never contacted, a report was never made, and [the complainant] never received any type of counseling.”
The Bakersfield police determined that the complainant had not been kidnapped, but instead had been staying with friends in Fresno, California. Officers contacted one of her friends, who indicated that the complainant “had been raped several times and ‘her husband was in on it.’ ” The friend also explained that the complainant had been “hiding out in Colorado earlier this week, where she was assaulted by her brother.” Finally, the friend noted that the complainant had alleged that her brother raped her.
The Bakersfield police reports also reflect that the complainant admitted that she had called her father to report that she had been kidnapped. She told Lerman that she had been kidnapped by a “white male adult, late 20’s, 5’9”, 200 pounds, with black, curly, medium length hair, light complexion, mustache, wearing black pants and a *307 white and blue striped shirt.” Lerman indicated that the complainant claimed that the man had taken her to “a concrete block room where there were no lights or windows” and forced her to swallow six large white pills at knifepoint. Lerman also noted that the complainant “later recanted this version of the incident, stating it never occurred,” and that her friends from Fresno had picked her up at the restaurant where she had been lunching with her mother and a friend.
Another Bakersfield police investigation “revealed a possible assault had taken place against [the complainant], as she had some injuries consistent with a sexual assault.” Lerman again interviewed the complainant, who claimed that she had been accosted by “a white male adult, with short, black hair, wearing a green and gray mask, which covered his mouth, chin and nose; dirty jeans; and a short-sleeve shirt with the sleeves rolled up.” The complainant further claimed that the man had raped her “between two cars parked in the parking lot” of the restaurant and that she had been sexually assaulted at a Colorado motel while traveling to California. However, Lerman noted that the complainant provided no details regarding the assault and was “very uncooperative.” She also refused to submit to a sexual-assault examination at a hospital.
The complainant also told Lerman that the 15-minute attack had occurred while she was outside the restaurant before entering and eating with her family. Lerman asked the complainant’s mother if her daughter had appeared to be upset while they were having lunch, and her mother said that her daughter seemed fine. Lerman asked a colleague if he believed the complainant needed “psychiatric evaluation.”
Lerman later contacted one of the complainant’s friends in Fresno. The friend explained that she had *308 picked up the complainant at the restaurant on the day of the complainant’s disappearance. The friend also indicated that the complainant “made no mention of a sexual assault at that time.” When Lerman told the friend that the complainant had alleged that she had been kidnapped, taken to an unknown location, and given pills, the friend said: “That is not true. That is so untrue. That never happened.” When Lerman asked her why she believed the complainant would tell Lerman such a thing, the friend stated, “I have no idea.”
The second Bakersfield police report, dated October 1, 2001, indicated that on the previous day, the complainant appeared at an emergency room in a California hospital and announced that she had been raped. Bakersfield Police Officer A. Gavin talked with her at the hospital. She told him that she had been accosted by
a Hispanic male, late 20’s to early 30’s, 5’6”, 180 pounds, medium build, with black, curly hair, short in front and long in back, last seen wearing a green plastic, surgical type mask over his face, a light blue work shirt with no emblem on it, with the sleeves rolled up, dirty in appearance, dirty blue jeans and dirty tennis shoes.
Gavin’s report further stated:
[The complainant] said when they reached the south parking lot of the restaurant, she saw two vans parked next to each other. The suspect then pushed her in between these two vans. She said the suspect was wearing a small, hand-held, gray flashlight hooked on his belt with some type of leather strap. [The complainant] said he removed the flashlight from his belt with his right hand, reached down the front of her pants, and moved her underwear aside. He then inserted the flashlight into her vagina. I asked [the complainant] what she was wearing when this occurred and she told me it was the same clothing she was currently wearing. She told me she had not changed clothing since the incident occurred. I asked [the complainant] if she had showered or douched and she said she *309 had taken one shower since the incident. I asked [the complainant] if the suspect said anything to her when he was putting the flashlight into her vagina and she said he never said anything. She said he did this for a few seconds and he then removed the flashlight and inserted one of his fingers inside her vagina.
[The complainant] said she began screaming and the suspect yelled at her to stop screaming. She said he undid his pants and exposed his erect penis. He was able to move her pants and underwear aside and insert his penis into her vagina. [The complainant] said she began hitting him and he put his hands on her thighs and tried to keep her from squirming around. She said she screamed again and the suspect ran south through the parking lot toward the businesses located south of the restaurant. She never saw a vehicle. [The complainant] said the suspect did not ejaculate inside her vagina.
[The complainant] said she does not believe she could identify the suspect again if she were to see him again because he was wearing some type of mask over his face. She described this mask as green and said it reminded her of a mask a gardener or doctor might wear.
I asked [the complainant] what happened after the suspect fled and she said she retrieved her purse from the sidewalk in front of the restaurant where she had dropped it. She then went back inside the business and sat with her mother and two aunts and acted like nothing happened. [The complainant] said she ordered a cup of tea and sat silently while the three others conversed. I asked her why she did not say anything to her family and she said she was in shock. I asked [the complainant] if her family members would find it odd that they had made lunch arrangements, but she had not ordered any lunch and sat silently while the other three women socialized. She said that was typical behavior for her.
I asked [the complainant] why she was afraid to tell her family, the police, or anyone else about the incident in the parking lot. She told me she was afraid no one would believe her because this had happened once before. She told me approximately six months ago, while in Michigan, she *310 had been raped in the parking lot of a grocery store while getting out of her vehicle. [The complainant] said she was in shock and could not believe it had happened again.
The complainant also told Gavin that she had met her Fresno friend through an online rape support group. She explained that she had joined the group before being raped in Michigan because she had been “raped when she was six years old.” She further explained that she had been “in and out of support groups and therapy for years.” However, Gavin’s report noted that the complainant’s husband expressed “a difficult time believing [the complainant] was telling the truth.”
2. THE FRESNO, CALIFORNIA POLICE REPORT
The third and final report was made by the Fresno Police Department. That report stemmed from a friend expressing concern about the complainant’s allegations. The friend stated that the complainant was “possibl[y] mentally unstable and may try to file false allegations . . . .” The report also reflected that the complainant had met one of her Fresno friends “about 18 months ago online and has been talking to her online and on the phone since then.” It further stated:
[The complainant], who is from an unknown city in Michigan, claims that approximately 18 months ago, her brother and his friends gang-raped her. She reported this crime and the suspects were arrested and convicted.
She states that her brother got out of jail a week ago and found her in Colorado, where she was staying with her husband to hide from her brother. [The complainant] told [a friend] that her brother raped her again on Monday and was not supposed to know where she and her husband were.
The Fresno police officer who completed this report believed that the complainant had lied to her Fresno *311 friends, her family, and law enforcement. The report concluded that “[the complainant] told her family and Bakersfield [Police Department] she was being held against her will in Fresno, which was not true. [The complainant] is possibly mentally unstable.”
C. PROCEDURAL HISTORY OF THIS APPEAL
Armed with these newly discovered police reports, in March 2006 defendant filed a pro se motion for relief from the judgment and requesting a new trial. The trial court denied the motion. The court acknowledged that the newly discovered evidence would have been admissible at trial to test the complainant’s credibility. But the court concluded that it was bound by several Court of Appeals decisions holding that newly discovered impeachment evidence cannot be the basis for granting a new trial.
The Court of Appeals denied defendant’s application for leave to appeal.[5] We remanded the case to the Court of Appeals for consideration as on leave granted, directing it “to consider whether defendant has a reasonably likely chance of acquittal in light of the newly discovered evidence and in light of the evidence presented against defendant that did not involve the complainant’s credibility.”[6]
On remand, the Court of Appeals majority held that newly discovered evidence cannot form the basis for granting a new trial if its sole purpose is to impeach a witness’s credibility.[7] It also held that, even if the newly *312 discovered evidence were admissible and could have provided a basis for granting a new trial, defendant had no reasonable chance of acquittal.[8] It opined that there was other evidence supporting defendant’s conviction that was not dependent on the complainant’s credibility.[9] Therefore, the Court affirmed the trial court’s denial of defendant’s motion for relief from the judgment.
Judge GLEICHER dissented. She opined that defendant was reasonably likely to be acquitted on retrial in light of the newly discovered evidence.[10]
We granted defendant’s application for leave to appeal.[11]
II. ANALYSIS
We review for an abuse of discretion a trial court’s decision to grant or deny a motion for new trial.[12]
A. LEGAL BACKGROUND
Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence.[13] This policy is consistent with requiring parties to “ ‘use care, diligence, and vigilance in securing and presenting evidence.’ ”[14] We have identified *313 several evaluative criteria to apply when determining whether a new trial may be granted because of newly discovered evidence. We have explained that a defendant must show that
(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[15]
This test has been applied consistently for more than a century.[16]
In Spray v Ayotte, the Court added a caveat to the four-part test in the context of newly discovered impeachment evidence, noting that “[o]rdinarily a new trial will not be granted because of newly discovered evidence to impeach a witness.”[17] Like the traditional four-part test, Spray’s caveat has also endured since its inception.[18]
*314 Recently, in People v Armstrong, we reconsidered the significance of impeachment evidence and its use as grounds for granting a new trial.[19] We concluded that a defense attorney’s failure to introduce telephone records that contradicted the complainant’s trial testimony amounted to ineffective assistance of counsel and was sufficient for a new trial. We specifically noted the importance of evidence attacking the complainant’s credibility because “[t]he defense’s whole theory of the case was that the complainant had falsely accused defendant of rape. The attacks on the complainant’s credibility at trial were inconclusive, providing mere ‘he said, she said’ testimony contradicting the complainant’s version of the events.”[20] Thus, the impeachment evidence was found to be sufficiently important to the determination of guilt or innocence that it could change the result on retrial. In these circumstances, we held that a defendant might be entitled to a new trial.
Federal courts have employed an approach similar to Michigan’s with respect to newly discovered impeachment evidence. For example, the United States Court of Appeals for the Seventh Circuit has opined, “Of course it will be the rare case in which impeaching evidence warrants a new trial, because ordinarily such evidence will cast doubt at most on the testimony of only one of the witnesses.”[21] Yet the Seventh Circuit recognized that merely because
[t]he practice has been to deny new trials where the only newly discovered evidence was impeaching[,] ... the practice should not be taken to imply a rule that even if the *315 defendant proves that his conviction almost certainly rests on a lie, the [trial] judge is helpless to grant a new trial.”[22]
The Court further noted that
[i]f the government’s case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.[23]
Thus, newly discovered evidence that impeaches a witness’s testimony with false statements made in other cases is expressly permitted under Taglia.
Likewise, the United States Court of Appeals for the Third Circuit has held that “[trial] courts do not and should not ignore a claim that there has been a miscarriage of justice just because the newly discovered evidence supporting the claim could be categorized as impeachment in character.”[24] Rather, “[w]hen asked to grant a new trial solely on the basis of new impeachment evidence, a court carefully should examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence.”[25] In evaluating this evidence, the Third Circuit noted that “[t]here must be something more, i.e. a factual link between the heart of the witness’s testimony at trial and the new evidence. This link must suggest directly that the defendant was convicted *316 wrongly.”[26] Other circuits and authorities have reached similar conclusions.[27]
And in White v Coplan,[28] the United States Court of Appeals for the First Circuit explicitly rejected the notion that impeachment evidence lacks the power to alter a jury verdict. It held:
In this case, [the defendant’s] evidence was not merely “general” credibility evidence. That label applies to the traditional proofs — offered through character or reputation witnesses and sometimes through proof of specific instances of misbehavior, especially prior convictions — to support an inference that the witness has a tendency to lie. Once a staple of trials, modern evidence rules ... have significantly restricted such evidence without totally precluding it in all cases.
The evidence in this case was considerably more powerful. The past accusations were about sexual assaults, not lies on other subjects; and while sexual assaults may have some generic similarity, here the past accusations by the [witnesses] bore a close resemblance to [their] present testimony — in one case markedly so. In this regard the evidence of prior allegations is unusual.
If the prior accusations were false, it suggests a pattern and a pattern suggests an underlying motive (although without pinpointing its precise character). The strength of *317 impeachment evidence falls along a continuum. That a defendant told lies to his teacher in grade school is at one end; that the witness was bribed for his court testimony is at another. Many jurors would regard a set of similar past charges by the [witnesses], if shown to be false, as very potent proof in [the defendant’s] favor.
This “if,” of course, is the heart of the matter. If the witness were prepared to admit on the stand that a prior accusation of similar nature was false, it is hard to imagine good reason for excluding the evidence. Prior admitted lies of the same kind in similar circumstances could powerfully discredit the witness. No time-consuming excursion beyond the witness would be required. Further, the accusation being conceded to be untrue, inquiry would not require the witness to admit to prior sexual activity or assault.[29]
White's analysis stands as strong recognition of the utility of impeachment evidence in the context of prior false accusations. The newly discovered evidence in that case did not directly contradict the witnesses’ testimony at trial. It was nonetheless held sufficient to warrant a new trial because it significantly undermined the victims’ credibility on the question of whether the crime ever occurred.
Finally, the United States Supreme Court has recognized the significance of newly discovered impeachment evidence. In Napue v Illinois, the Court stated that “[t]he jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant’s life or liberty may depend.”[30]
It bears emphasizing that, as this Court recognized more than a century ago, newly discovered impeach *318 ment evidence ordinarily will not justify the grant of a new trial. Our decision today, therefore, does not disturb this unremarkable statement. It will be the rare case in which (1) the necessary exculpatory connection exists between the heart of the witness’s testimony at trial and the new impeachment evidence and (2) a different result is probable on retrial.[31] But when that rare case presents itself, a court should not refuse to grant a new trial solely on the ground that the newly discovered evidence is impeachment evidence. It should not refuse even if the new evidence is not directly contradictory to specific trial testimony.[32]
*319 In sum, there is ample authority that undercuts the Court of Appeals’ conclusion that newly discovered impeachment evidence can never be grounds for a new trial. Rather, impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in Cress. More specifically, newly discovered impeachment evidence satisfies Cress when (1) there is an exculpatory connection on a material matter between a witness’s testimony at trial and the new evidence[33] and (2) a different result is probable on retrial.[34]
The Court of Appeals majority in this case relied on People v Duncan[35] and People v Davis[36] for the proposition that newly discovered impeachment evidence is never grounds for a new trial. Duncan was a mere peremptory order of this Court. The Court of Appeals dissenting opinion whose reasoning this Court adopted in Duncan did not impose a blanket prohibition on granting a new trial because of newly discovered impeachment evidence.[37]
Davis’s alleged prohibition of new trials based on newly discovered impeachment evidence can be traced *320 to the 1967 Court of Appeals decision in Graham v Inskeep.[38] Yet Graham employed language consistent with our rule today, noting that “it is generally held that a new trial will not be granted if the newly-discovered evidence is merely to impeach.”[39] Graham left open the possibility that there may be circumstances under which newly discovered impeachment evidence warrants a new trial. Thus, Graham’s progeny transformed a general rule into a per se one. To the extent that any Michigan decisions impose a per se prohibition against granting a new trial in light of newly discovered impeachment evidence, they are hereby overruled.[40]
B. THE TRIAL COURT ABUSED ITS DISCRETION
As discussed earlier, granting a new trial on the basis of newly discovered evidence requires a defendant to show that (1) the evidence itself, not merely its materiality, is newly discovered, (2) the newly discovered evidence is not cumulative, (3) using reasonable diligence, the party could not have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial.
In this case, the prosecution did not contest the first three of these criteria in the lower courts. It conceded that the evidence was newly discovered, not cumulative, and that defendant could not have discovered and produced it at trial using reasonable diligence.[41]
*321 However, the trial court abused its discretion by denying defendant’s motion for relief from the judgment. It ruled that impeachment evidence “cannot form the basis for .. . granting] ... a new trial.” This ruling was legally incorrect. Accordingly, the trial court’s ruling was necessarily an abuse of discretion.
On remand, defendant is entitled to have the trial court carefully consider the newly discovered evidence in light of the evidence presented at trial. The trial court must evaluate the new evidence and determine whether there exists an exculpatory connection between it and the heart of the complainant’s testimony. The only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record.
III. CONCLUSION
We hold that newly discovered impeachment evidence generally is insufficient to warrant a new trial. However, such evidence may be grounds for a new trial if it satisfies the four-part test set forth in Cress. Newly discovered impeachment evidence concerning immaterial or collateral matters cannot satisfy Cress. But if it has an exculpatory connection to testimony concerning a material matter and a different result is probable, a new trial is warranted. It is not necessary that the evidence contradict specific testimony at trial. Because the trial court did not have the benefit of this clarification of the role of newly discovered impeachment evi *322 dence, a remand for application of the standards clarified here is appropriate.
For these reasons, we reverse the Court of Appeals’ judgment. We remand the case to the trial court for a determination of whether the newly discovered evidence satisfies Cress. The only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record. The trial court’s determination is to be made and communicated to this Court within 60 days of the date of this opinion.
We retain jurisdiction.
CAVANAGH, MARKMAN, and HATHAWAY, JJ., concurred with Marilyn Kelly, J.

 People v Cress, 468 Mich 678; 664 NW2d 174 (2003).

 MCL 750.520b(1)(f).

 People v Grissom, unpublished opinion per curiam of the Court of Appeals, issued November 18, 2004 (Docket No. 251427) (Grissom I).

 People v Grissom, 472 Mich 919 (2005).

 People v Grissom, unpublished order of the Court of Appeals, issued July 2, 2007 (Docket No. 274148).

 People v Grissom, 480 Mich 1140 (2008).

 People v Grissom, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 274148), p 10 (Grissom II). The Court of Appeals majority cited People v Duncan, 414 Mich 877 *312 (1982), and People v Davis, 199 Mich App 502, 516; 503 NW2d 457 (1993), for the proposition that newly discovered impeachment evidence cannot be the basis for a new trial.

 Grissom II, unpub op at 11.

 Id.

 Id. at 15 (Gleicher, J., dissenting).

 People v Grissom, 488 Mich 1031 (2011).

 People v Andrews, 360 Mich 572, 578; 104 NW2d 199 (1960).

 See, e.g., People v Pizzino, 313 Mich 97, 109; 20 NW2d 824 (1945), citing Canfield v City of Jackson, 112 Mich 120, 123; 70 NW 444 (1897).

 Pizzino, 313 Mich at 109, quoting Canfield, 112 Mich at 123 (citations and quotation marks omitted).

 People v Cress, 468 Mich 678, 692; 664 NW2d 174 (2003) (citations and quotation marks omitted).

 See, e.g., People v Clark, 363 Mich 643, 647; 110 NW2d 638 (1961); Canfield, 112 Mich at 123.

 Spray v Ayotte, 161 Mich 593, 595; 126 NW 530 (1910).

 See, e.g., Luckhurst v Schroeder, 183 Mich 487, 499-500; 149 NW 1009 (1914) (“Ordinarily, the court will not grant a new trial on the ground of newly discovered evidence where that evidence is for the purpose of impeachment.”), citing Spray, 161 Mich at 593-595; People v Serra, 301 Mich 124, 133; 3 NW2d 35 (1942) (“A new trial will not ordinarily he granted because of newly-discovered evidence to impeach a witness.”), citing Spray, 161 Mich 593; see also People v Barbara, 400 Mich 352, 363; 255 NW2d 171 (1977) (“Generally, too, where the new evidence is useful only to impeach a witness, it is deemed merely cumulative.”). Thus, if merely cumulative, newly discovered evidence would not satisfy the four-part test for granting a new trial. Nonetheless, Barbara noted that new impeachment evidence was “particularly significant when . . . the only evidence that an offense was ever committed was *314 largely based on the testimony of individuals whose credibility might be put into question by these new witnesses.” Barbara, 400 Mich at 363-364.

 People v Armstrong, 490 Mich 281; 806 NW2d 676 (2011).

 Id. at 291.

 United States v Taglia, 922 F2d 413, 415 (CA 7, 1991).

 Id. (emphasis added).

 Id. (emphasis added).

 United States v Quiles, 618 F3d 383, 391 (CA 3, 2010).

 Id. at 392.

 Id.

 See, e.g., United States v Davis, 960 F2d 820, 825 (CA 9, 1992) (“[N]ewly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness’ testimony totally incredible.”). Davis allowed the introduction of impeachment evidence that was entirely immaterial to the witness’s testimony at trial. As an example of newly discovered evidence that would warrant granting a new trial, Davis stated, “If newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the interest of justice would support a new trial.” Davis, 960 F2d at 825 (quotation marks omitted).

 White v Coplan, 399 F3d 18 (CA 1, 2005).

 Id. at 24-25.

 Napue v Illinois, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).

 See Quiles, 618 F3d at 392.

 The dissent relies on Spray and 29 Mack, Cyclopedia of Law & Procedure, pp 918-921, for the proposition that “newly discovered evidence that contradicts particular and material statements in a witness’s testimony could potentially satisfy [the Cress] factors for granting a new trial, as opposed to newly discovered evidence that only serves to impeach a witness’s credibility.” Post at 347. This misstates Spray’s holding. Spray stands only for the uncontroversial proposition that, generally, a new trial will not be granted because of newly discovered impeachment evidence.
Nor does the Cyclopedia of Law & Procedure support the limitation the dissent places on newly discovered impeachment evidence. The treatise makes no reference to a need for the evidence to specifically contradict particular statements. The treatise states that “[n]ewly discovered evidence to successfully contradict a witness upon a material matter may be cause for allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness.” Our holding is entirely consistent with this statement. Accordingly, the entire basis for the dissent’s conclusion that the newly discovered evidence does not make a different result probable on retrial is based on a flawed and baseless assumption: that this evidence must contradict a particular statement in a witness’s testimony. It is telling that the prosecution conceded in its brief to this Court that “neither this Court nor the Court of Appeals has ever indicated that the entire entry from the Cyclopedia has been incorporated into Michigan law.” In any event, the dissent judicially engrafts the word “particular” onto the passage quoted from the treatise and, in doing so, gives the 100-year-old passage a meaning its authors never imagined.
*319 In sum, there is no precedent, in Michigan or elsewhere, recognizing such a limited utility for newly discovered impeachment evidence. The dissent has no authority for its claim that newly discovered impeachment evidence can be considered only if it directly contradicts a particular statement in a witness’s testimony.

 See Quiles, 618 F3d at 392.

 See Cress, 468 Mich at 692. The prosecution contends that for newly discovered impeachment evidence to satisfy Cress, it must directly contradict a witness’s testimony at trial. We disagree. There is no precedent in Michigan for such a narrow interpretation of the proper scope of newly discovered impeachment evidence.

 Duncan, 414 Mich 877.

 Davis, 199 Mich App at 516.

 See People v Duncan, 96 Mich App 614, 618-620; 293 NW2d 648 (1980) (R. B. Burns, P.J., dissenting).

 Graham v Inskeep, 5 Mich App 514; 147 NW2d 436 (1967).

 Id. at 523 (emphasis added; quotation marks omitted).

 See, e.g., People v Sharbnow, 174 Mich App 94; 435 NW2d 772 (1989); People v Snell, 118 Mich App 750; 325 NW2d 563 (1982).

 The prosecution argues before this Court for the first time that defendant’s newly discovered evidence is merely cumulative and thus does not satisfy the four-part test. This issue is unpreserved, but in any event, it lacks merit. The newly discovered evidence is not cumulative *321 because at trial defendant did not impugn the complainant’s credibility with evidence that she had made previous false rape accusations. Defendant was unable to present “evidence of the same kind to the same point” at trial. Murray v Weber, 92 Iowa 757, 758; 60 NW 492 (1894). Thus, the prosecution’s initial concession was correct because defendant’s newly discovered evidence is not cumulative.