*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 24, 2020

Plaintiff-Appellee,

v

No. 346072
Wayne Circuit Court
LC No. 17-002126-02-FC

MARGUERITE ANNETTE PICKENS,

Defendant-Appellant.

Before: JANSEN, P.J., and K. F. KELLY and CAMERON, JJ.

PER CURIAM.

Defendant appeals as of right her jury convictions of first-degree premeditated murder, MCL 750.316(1)(a), and first-degree felony murder, MCL 750.316(1)(b), for which she was sentenced to life imprisonment without parole. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the death of 36-year-old Carissa Oakman inside her Detroit apartment during the early morning hours of January 19, 2017. Defendant owned the apartment building, and Carissa shared her apartment with Tamika Davis. The prosecution's theory at trial was that defendant planned and participated in Carissa's murder because of a dispute over money and marijuana, and because of Carissa's threats to go to the police about defendant's illegal activity. The prosecution presented evidence that defendant joined Orlandus Calhoun and Antenidus Collier in killing Carissa inside her apartment. Orlandus and Antenidus were also charged with first-degree murder, but both pleaded guilty to second-degree murder pursuant to plea agreements in exchange for their testimony at defendant's trial. According to their testimony, defendant instructed them to kill Carissa, and then Orlandus smothered Carissa while Antenidus helped hold her down. Defendant assisted by kicking and striking Carissa with a baseball bat, punctuating each time the bat hit Carissa's body by calling Carissa a "b\*\*ch." After Carissa was killed, defendant instructed Orlandus and Antenidus to get rid of her body.

Video surveillance evidence showed that defendant was present in the apartment building at the time of Carissa's death, and that she was actively engaging with Orlandus and Calhoun as they were preparing a truck to transport Carissa's body away from the building. Evidence also

confirmed that defendant helped carry Carissa's body out of the apartment toward the waiting truck. Orlandus and Antenidus transported the body to an abandoned garage, where it was discovered 12 days later. Carissa's roommate, Tamika Davis, admitted being present during the offense, but denied any participation in killing Carissa. Tamika did admit, however, to holding the door open for Orlandus and Antenidus as they carried Carissa's body out of the building. The medical examiner determined that the cause of Carissa's death was smothering and other contributing multiple injuries. Defendant testified at trial and maintained that she was not in the apartment when Carissa was killed, and that she had no idea what happened to Carissa. Defendant was convicted and sentenced as noted above, and this appeal followed.

## II. JURY VERDICT FORMS

Defendant first argues that the verdict forms provided to the jury were constitutionally deficient because they did not provide the jury with the option to return a general verdict of not guilty. Defendant also claims that defense counsel was ineffective for objecting to the jury verdict forms. We disagree.

A jury verdict form is part of the trial court's instructions to the jury. *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). This Court generally reviews de novo a defendant's claim of instructional error. *People v Haynie*, 327 Mich App 555, 559; 934 NW2d 71 (2019), lv gtd 504 Mich 974 (2019). However, unpreserved claims of constitutional error are reviewed for plain error affecting the defendant's substantial rights. *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). With regard to defendant's claim of ineffective assistance of counsel, because defendant did not file a motion for a new trial or request for an evidentiary hearing in the trial court, our review of that issue is limited to mistakes apparent from the record. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018).

Preliminarily, we agree with plaintiff that this issue may be considered waived because defense counsel expressly approved the jury verdict forms used in this case. *Kowalski*, 489 Mich at 502-503. Defendant's reliance on *People v Oros*, 320 Mich App 146; 904 NW2d 209 (2017), rev'd on other grounds 502 Mich 229 (2018), in support of her argument that the alleged error could not be waived is misplaced because *Oros* is factually and legally distinguishable: that case did not involve a challenge to the jury verdict form as part of the jury instructions. Defendant is correct that her right to a jury trial cannot be waived by counsel without being fully informed and publicly acknowledged consent. See *People v Cook*, 285 Mich App 420, 423; 776 NW2d 164 (2009). However, the alleged error in this case does not implicate defendant's right to a jury, but rather her right to a properly instructed jury. Thus, the alleged instructional error at issue, relating specifically to the jury verdict forms and the court's instructions to the jury, is more akin to the instructional error set forth in *Kowalski*, which the Court determined was waived by counsel's approval of the instruction at issue. *Kowalski*, 489 Mich at 503. Regardless, even if the alleged error was not waived, defendant would not be entitled to appellate relief.

As this Court observed in *People v Miller*, 326 Mich App 719, 727; 929 NW2d 821 (2019):

> "A criminal defendant has a constitutional right to have a jury determine his or her guilt from its consideration of every essential element of the charged offense." [*Kowalski*, 489 Mich at 501]. A defendant is entitled to have the elements

of the crime submitted to the jury in a way that is "neither erroneous nor misleading[.]" *Id*. (quotation marks and citation omitted). However, "an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights." *Id*. at 501-502.

In *People v Wade*, 283 Mich App 462, 463; 771 NW2d 447 (2009), the defendant appealed his jury convictions of involuntary manslaughter and felony-firearm. On appeal, the defendant argued that the jury verdict form was improper and deprived him of his constitutional right to trial by jury. *Id*. at 450. This Court concluded that the form was constitutionally deficient because "it did not give the jury the opportunity to return a general verdict of not guilty." *Id*. at 468. This Court acknowledged that if the form had included a box in which the jury could find the defendant not guilty of both second-degree murder and involuntary manslaughter, an error of constitutional magnitude requiring reversal would not have occurred. *Id*. The jury verdict form in *Wade* stated:

POSSIBLE VERDICTS

YOU MAY RETURN ONLY ONE VERDICT FOR EACH COUNT.

COUNT 1- HOMICIDE-MURDER FIRST DEGREE-PREMEDITATED (EDWARD BROWDER, JR)

__ NOT GUILTY

__ GUILTY

OR

__ GUILTY OF THE LESSER OFFENSE OF-HOMICIDE-MURDER SECOND DEGREE (EDWARD BROWDER, JR.)

OR

__ GUILTY OF THE LESSER OFFENSE OF-INVOLUNTARY MANSLAUGHTER-FIREARM INTENTIONALLY AIMED (EDWARD BROWDER, JR.)

COUNT 2-WEAPONS-FELONY FIREARM

__ GUILTY

__ NOT GUILTY

In holding that this form did not give the jury the opportunity to return a general verdict of not guilty, this Court explained:

Despite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the

-3-

opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses such that his constitutional right to a trial by jury was violated. [*Id*. at 468.]

The jury verdict form in this case provided the jury with the following options for returning a verdict on Count I, first-degree premeditated murder:

## COUNT 1:

### FIRST DEGREE PREMEDITATED MURDER

YOU MAY RETURN ONLY ONE VERDICT ON THIS CHARGE.

**MARK ONLY <u>ONE</u> BOX ON THIS SHEET.**

___ NOT GUILTY

___ GUILTY OF FIRST DEGREE PREMEDITATED MURDER; OR

____GUILTY OF THE LESSOR OFFENSE OF SECOND DEGREE MURDER

Similarly, the jury verdict form provided the following options for returning a verdict on Count II, first-degree felony murder:

## COUNT 2

### FIRST DEGREE FELONY MURDER

YOU MAY RETURN ONLY ONE VERDICT ON THIS CHARGE.

**MARK ONLY <u>ONE</u> BOX ON THIS SHEET.**

___ NOT GUILTY

___ GUILTY OF FIRST DEGREE FELONY MURDER; OR

___ GUILTY OF THE LESSOR OFFENSE OF SECOND DEGREE MURDER

The trial court instructed the jury in the following manner:

You may find the defendant guilty or you may find the defendant not guilty of all the crimes, you may find the Defendant not guilty or guilty of any combination of the crimes.

Both jury verdict forms initially provided the jury with the option to render a general verdict of not guilty. It was only *after* the jury rejected the option of a general not guilty verdict that it would have proceeded to determine whether defendant was guilty of first-degree premeditated murder and first-degree felony murder, *or* guilty of the lesser offense of second-degree murder. Unlike the jury verdict form in *Wade,* 283 Mich App at 465, which limited the

-4-

jury's option of a not guilty verdict to only the count of first-degree murder and did not include the same option for the lesser included offenses of second-degree murder and involuntary manslaughter, the jury here was clearly provided with the option to enter a general not guilty verdict. Accordingly, there was no error. Moreover, had trial counsel raised an objection to the jury verdict forms, her objection would have been futile, given that the jury verdict forms did not violate defendant's right to have the jury presented with the opportunity to return a general verdict of not guilty. Trial counsel is not required to raise a futile objection or argue a legal position that does not have merit. See *People v Muhammad*, 326 Mich App 40, 58 n 7; 931 NW2d 20 (2018). Therefore, defense counsel was not ineffective for failing to object to the jury verdict forms.

## III. NEWLY DISCOVERED EVIDENCE

Defendant next argues that she is entitled to a new trial on the basis of newly discovered evidence that Antenidus perjured himself at trial when he implicated defendant in Carissa's murder. We disagree.

To preserve the issue of newly discovered evidence, a defendant must raise the issue in a motion for a new trial in the trial court. *People v Darden*, 230 Mich App 597, 605-606; 585 NW2d 27 (1998). Although defendant did not raise this issue in the trial court, he raised this issue in a motion to remand filed in this Court. This Court denied the motion "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." *People v Pickens*, unpublished order of the Court of Appeals, entered September 6, 2019 (Docket No. 346072). Having considered the issue, we conclude that defendant is not entitled to a new trial with respect to this issue.

In support of her argument, defendant relies on an affidavit from Antenidus's prison cellmate, Ray Taylor, who averred that Antenidus admitted to him that he lied at defendant's trial. Taylor's affidavit alleges, in pertinent part:

> 3. I was informed by [Antenidus] that he lied on [sic] [defendant] in order to get her life in prison [sic], and to get himself a deal of incarceration for 18 years.
>
> 4. [Antenidus] further informed me that he worked as a land scrapper [sic] of [defendant's] building, and that he became romantically involved with her.
>
> 5. Although he broke off the relationship for more than a year, he stated that he returned in order to use [defendant] for money, sex, clothes, and to get her to buy him a new truck.
>
> 6. [Antenidus] stated that he discovered that [defendant] was in a relationship with her maintenance man named [Orlandus], but that she agreed to engage in relationships with both of them, which caused angry feelings between the men.
>
> 7. [Antenidus] stated that he met a woman named Carissa, who was a tenant in [defendant's] building growing marijuana, and he further stated that he wanted to start a [marijuana] grow operation in his own home.

-5-

8. [Antenidus] indicated that he heard an argument between Carissa and a woman named [Tamika], and that [Orlandus] ran to Carissa's apartment and began to beat and choke her.

9. [Antenidus] stated that [Orlandus] was trying to prove his loyalty to [defendant] in his assault on Carissa, but that [defendant] never told [Orlandus] to hurt or do anything to Carissa.

10. [Antenidus] stated that he went into the apartment and grabbed Carissa's legs while [Orlandus] continued to beat and choke her.

11. [Antenidus] further stated that after [Orlandus] had killed Carissa, [Orlandus] wrapped her in plastic bags that were supplied by [Tamika], and they dropped the body inside a garage

12. As I heard this story from [Antenidus], I called him names and stated that he was a coward for putting a woman in prison for a crime she did not commit.

13. As a result of my comments to [Antenidus], we had a fight in my own cell.

14. I have not been bribed, coerced, or threatened to make these statements.

15. I am willing to testify in court concerning these comments, and I am also willing to take a polygraph [test], if necessary.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must satisfy the following four requirements:

(1) "the evidence itself, not merely its materiality, was newly discovered"; (2) "the newly discovered evidence was not cumulative"; (3) "the party could not, using reasonable diligence, have discovered and produced the evidence at trial"; and (4) *the new evidence makes a different result probable on retrial*. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), quoting *People v Johnson*, 451 Mich 115, 118 n 6; 545 NW2d 637 (1996) (emphasis added).]

One of the key considerations to consider when determining whether the new evidence would render a different result probable on retrial is the credibility of the evidence. *People v Johnson*, 502 Mich 541, 566-567; 918 NW2d 676 (2018). In *Johnson*, in the procedural context of reviewing the trial court's decision on a motion for a new trial, our Supreme Court instructed that in determining whether a new trial is necessary, the trial court has the onus of weighing "all relevant factors" that either tend to bolster or undermine the veracity of the witness. *Id*. at 567. Because the dispositive question is whether a new trial is warranted, the court does not operate as the fact-finder; rather, the pivotal inquiry is whether a *reasonable juror* could conclude that the new evidence is credible. *Id*. at 567. Once the evidence is determined to be credible, the next consideration is "the impact of that testimony in conjunction with the evidence that would be presented on retrial." *Id*. at 571. The Supreme Court explained:

In examining whether this "new evidence makes a different result probable on retrial," the trial court must consider the evidence that was previously introduced at trial. *Cress*, 468 Mich at 692; see also *People v Grissom*, 492 Mich 296, 321, 821 NW2d 50 (2012) (ordering "the trial court [on remand to] carefully consider the newly discovered evidence *in light of the evidence presented at trial*") (emphasis added). The trial court must also consider the evidence that would be admitted at *retrial*, which in this case includes the recantation testimony. *Cress* specifically uses the term "retrial," which refers to a *new* trial. Thus, the evidence that must be taken into consideration when assessing a claim of newly discovered evidence is not simply the evidence presented at the original trial, but also the evidence that would be presented at a new trial. *Cress*, 468 Mich at 694 ("[The confessor's] testimony (even presuming he would testify at a *new* trial) would not make a different result probable on retrial.") (emphasis added in original). [*Johnson*, 502 Mich at 571-572.]

In *Grissom*, 492 Mich at 299-300, the Supreme Court recognized that newly discovered impeachment evidence *may* provide the basis for a new trial if it meets the four requirements of *Cress*, and a "material, exculpatory connection . . . exist[s] between the newly discovered evidence and significantly important evidence presented at trial." However, the Court cautioned that such cases will be "rare[.]" *Id*. at 318.

[I]mpeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in *Cress*. More specifically, newly discovered impeachment evidence satisfies *Cress* when (1) there is an exculpatory connection on a material matter between a witness's testimony at trial and the new evidence and (2) a different result is probable on retrial. [*Id*. at 319.]

Plaintiff does not appear to contest that the evidence at issue meets the first three requirements of *Cress*, namely, that it is newly discovered, not cumulative, and that it could not have been discovered and produced, with reasonable diligence, at trial. *Cress*, 468 Mich at 692. Instead, the parties focus on whether an exculpatory connection was established on a material matter between Antenidus's testimony and Taylor's allegations and if a different result is probable on retrial. In our view, defendant's contention that an "exculpatory connection" exists on a key matter between Antenidus's testimony at trial and Taylor's allegation, *Grissom*, 492 Mich at 319, is tenuous. While Taylor claimed that Antenidus admitted to perjuring himself at trial, and that defendant did not instruct Orlandus "to hurt or do anything to Carissa," the exculpatory value of this evidence is dubious, given that Orlandus, Tamika, and more significantly, Mark Pettis, who had no apparent motivation to fabricate his testimony, all testified consistently that defendant told Orlandus to kill Carissa.

However, the weak link in defendant's argument is that she simply cannot establish that a different result is probable on retrial. *Grissom*, 492 Mich at 319; *Cress*, 468 Mich at 692. Even if we were to conclude that a reasonable juror could find that Taylor's allegations were credible, rendering Antenidus's testimony dubious, overwhelming other evidence established that defendant was indeed the mastermind who orchestrated Carissa's murder, enlisted the assistance of Orlandus, Antenidus, and Tamika in the actual commission of the crime, that defendant herself willingly and actively participated in the killing and removal of Carissa's body from the building, and that in the

weeks that followed defendant engaged in a deliberate scheme to mislead authorities about Carissa's whereabouts and circumstances of her disappearance. Put simply, considering not only the evidence that the prosecution presented at trial, but also the evidence that would be presented at retrial, including Taylor's testimony, a different result would not be probable on retrial.

Evidence at trial established that defendant and Carissa were involved in a contentious and acrimonious dispute in the hours leading up to Carissa's death. For example, Danette Salazar, Carissa's best friend, testified that Carissa texted her with serious allegations against defendant, including that the charity that defendant ran, a Kind Hand, was engaged in fraudulent transactions and that defendant was attempting to have Carissa framed and arrested. Xavier Rouse testified that in the hours leading up to Carissa's murder, Carissa and defendant were embroiled in a dispute concerning marijuana and money, Carissa sent him text messages to that effect, and Carissa wanted to move out of defendant's apartment building. Housan Al-Amin also testified about the financial disputes that Carissa and defendant were having before Carissa's murder, particularly with regard to approximately $4,000 in insurance money proceeds for Carissa's vehicle. Defendant also encouraged Housan to pick Carissa up from the apartment building, and threaten to kill Carissa if he did not do so.

Evidence at trial also confirmed that defendant was present in Carissa's bedroom when she was killed, and that she was an active participant. Mark Pettis, who lived in the apartment above Carissa's apartment, testified that he overheard defendant tell Orlandus to "kill the b**ch" during the early morning hours of January 19, 2017, at the same time he heard Carissa pleading for her life. Nina Pettis corroborated this testimony, explaining that she also heard Carissa crying for help, which prompted her to go downstairs to Carissa's apartment at approximately 2:30 a.m., at which time defendant and Tamika Davis answered the door together. When Nina returned to her own apartment, defendant knocked on her door to inform her that defendant had instructed Orlandus to beat up Carissa because Carissa had stolen money. Orlandus testified that defendant repeatedly told him to "kill the b**ch" (referring to Carissa), and that defendant attacked Carissa and hit her repeatedly with a baseball bat. Defendant handed Orlandus a bag to place over Carissa's body, she gave Antenidus gloves as Antenidus and Orlandus prepared to transport the body, and she helped carry the body out of the apartment. Tamika Davis also testified that defendant violently kicked Carissa in the head repeatedly, stating that Carissa "don't [sic] need to live." Surveillance footage of the outside of the apartment building showed that defendant was present, peeking her head out of the building, when Antenidus and Orlandus were preparing the truck in which to transport Carissa's body. After the crime, defendant and Orlandus texted back and forth, and Orlandus asked defendant if he could drive one of her trucks in exchange for handling the "dirty work" of Carissa's murder. Defendant and Orlandus also texted back and forth when the police arrived at the apartment building on January 31, 2017, to investigate after the discovery of Carissa's body, Orlandus inquired of defendant if the police were asking about names of people potentially involved in Carissa's disappearance, and he encouraged defendant to provide the police with an alias for him.

In sum, even if a reasonable juror were to accept and completely believe Taylor's assertions that Antenidus was lying about defendant's involvement in Carissa's death, the record contains voluminous other evidence confirming that defendant was present when Carissa was killed, that she encouraged and instructed Orlandus to kill Carissa, and that defendant intervened herself, repeatedly kicking Carissa in the head and beating her with a baseball bat while calling her a b**ch.

Moreover, the evidence at trial established that defendant had a motive to kill Carissa because of Carissa's plans to contact the police about the $4,000 insurance proceeds, as well as defendant's charitable organization that allegedly was involved in fraudulent activity. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) (recognizing that while not a required element of an offense, motive is a relevant consideration in a murder prosecution). Accordingly, defendant has not demonstrated that the alleged newly discovered evidence, even if credited, would render a different result probable on retrial. *Grissom*, 492 Mich at 319; *Cress*, 468 Mich at 692. Therefore, defendant has not demonstrated that she is entitled to a new trial with respect to this issue.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that she is entitled to a new trial because the prosecutor impermissibly vouched for the credibility of Antenidus and Orlandus by eliciting that they each pleaded guilty of second-degree murder pursuant to plea agreements that required them to testify truthfully at defendant's trial. We disagree.

Defendant concedes that there was no objection to the prosecutor's conduct at trial. Therefore, this issue is unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). We review unpreserved claims of prosecutorial misconduct for plain error affecting defendant's substantial rights. *People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 345601); slip op at 6. Defendant also argues that defense counsel was ineffective for failing to object to the prosecutor's conduct. Because defendant did not raise an ineffective assistance claim in the trial court, our review of that issue is limited to mistakes apparent from the record. *Head*, 323 Mich App at 538-539.

As this Court recently observed in *Anderson*, ___ Mich App at ___; slip op at 6:

> "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64.

In *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995), the Michigan Supreme Court recognized that "[i]ncluded in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness's truthfulness." Although plea agreements containing a promise of truthfulness should be admitted with caution, reference to such agreements does not require reversal "unless it is used to suggest that the government has some special knowledge, not known to the jury, that the witness was testifying truthfully." *Id*. (citation omitted); *People v McGhee*, 268 Mich App 600, 630; 709 NW2d 595 (2005); see also *People v Jackson* (*On Reconsideration*), 313 Mich App 409, 426; 884 NW2d 297 (2015).

Our review of the prosecutor's questioning of Antenidus and Orlandus, as well as the prosecutor's opening statement and closing argument, confirms that the prosecutor at no point suggested that she had special knowledge regarding whether these witnesses were telling the truth during their testimony. Additionally, while the prosecutor questioned both Antenidus and

Orlandus regarding their plea agreements, the prosecutor at no point stated or implied that the agreements demonstrated that the prosecutor possessed any knowledge or information outside of what was presented to the jury regarding the truthfulness of each witness. Therefore, defendant's claim of improper vouching by the prosecutor is unavailing. Moreover, trial counsel's performance was in no way deficient, given that counsel had no grounds for an objection and failure to raise a meritless objection does not amount to ineffective assistance of counsel. *Muhammad*, 326 Mich App at 58 n 7.

## V. INSTRUCTIONAL ERROR

Defendant next argues that the trial court erred by denying her requests for (1) a "mere presence" instruction, M Crim JI 8.5, related to the prosecution's aiding or abetting theory of guilt, and (2) a "missing witness" instruction, M Crim JI 5.12, related to Tamika Davis's absence at trial. We disagree with both arguments.

"[T]his Court views the instructions as a whole to determine whether the issues to be tried were adequately presented to the jury." *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014). "This Court reviews for an abuse of discretion the trial court's decision regarding the applicability of a jury instruction to the facts of a specific case." *Id.* A trial court's determination whether the prosecution exercised due diligence to secure the presence of a witness at trial is also reviewed for an abuse of discretion. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). Likewise, the trial court's decision whether to provide a "missing witness instruction" is reviewed for an abuse of discretion. *People v Steel*, 283 Mich App 472, 485; 769 NW2d 256 (2009). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Everett*, 318 Mich App 511, 518; 899 NW2d 94 (2017).

## A. MERE PRESENCE INSTRUCTION

The prosecution's theory at trial was that defendant was guilty of first-degree murder as both a direct participant in Carissa's murder and for aiding or abetting Antenidus and Orlandus in causing Carissa's death. MCL 767.39 provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Aiding or abetting is simply a different theory of prosecution, and will result in the imposition of vicarious liability for an accomplice to a crime. *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006). To obtain a conviction under an aiding or abetting theory, the prosecution must satisfy the following elements:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Id.* (citations and quotation marks omitted).]

-10-

Defendant challenges the trial court's refusal to instruct the jury in accordance with M Crim JI 8.5, which provides:

> Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it.

It is well-settled that "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *People v Norris*, 236 Mich App 411, 419; 600 NW2d 658 (1999).

Jury instructions "must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *Armstrong*, 305 Mich App at 240. However, a rational view of the evidence must support a requested instruction. In this case, the testimony of the prosecution witnesses demonstrated that defendant not only was present when Carissa was killed, but actively participated by ordering Orlandus to kill Carissa, and by personally assaulting Carissa by kicking her in the head and hitting her with a baseball bat. Conversely, defendant maintained during her testimony that she was not present in Carissa's apartment when Carissa was killed, but rather was in her office and then left to go home. Although defendant's office was in close proximity to Carissa's apartment, defendant denied knowing that any crime was being committed there. Thus, while the jury was presented with conflicting evidence regarding whether defendant was present when Carissa was killed, neither of the conflicting views supported a finding that defendant was present, but was not involved in the commission of the crime. Accordingly, because a rational view of the evidence did not support the requested mere presence instruction, the trial did not err by declining to give the instruction. We further note, however, that despite the trial court's ruling, the aiding or abetting instruction that the court provided to the jury included an instruction that "the mere fact that [defendant] was present when [the crime] was committed is not enough to prove that she assisted in committing it." Thus, the jury was adequately informed that defendant's mere presence in Carissa's apartment was not enough to convict her under an aiding or abetting theory. Therefore, we reject this claim of error.

## B. MISSING WITNESS INSTRUCTION

The trial court allowed the prosecution to present Tamika Davis's preliminary examination testimony at defendant's trial after Davis failed to appear for trial. Defendant does not challenge that decision, but argues that the trial court erred by denying his request for a missing witness instruction related to Tamika's absence at trial. We disagree.

The prosecution may present a witness's preliminary examination testimony at trial under MRE 804(b)(1)[1] if it demonstrates that the witness is unavailable under MRE 804, which provides, in pertinent part:

---

[1] MRE 804 provides, in pertinent part:

-11-

**Definition of Unavailability**. "Unavailability as a witness" includes situations in which the declarant –

\* \* \*

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means, and in a criminal case, due diligence is shown. [*Bean*, 457 Mich at 683-684.]

As our Supreme Court stated in *Bean*, 457 Mich at 684:

The test for whether a witness is "unavailable" as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it. *Barber v Page*, 390 US 719, 724-725, 88 S Ct 1318; 20 L Ed 2d 255 (1968); [*People v Dye*, 431 Mich 58, 67, 83; 427 NW2d 501 (1988)].

Unless the prosecution has already sought to remove a witness from its witness list under MCL 767.40a, the prosecution must exercise due diligence to produce a witness that it has endorsed under MCL 767.40a(3). *Everett*, 318 Mich App at 518. "If the prosecution fails to produce a witness who has not been properly excused, the trial court has discretion in fashioning a remedy for the violation of MCL 767.40a, which may include a missing witness instruction." *Everett*, 318 Mich App at 519. Put simply, "[a] missing witness instruction is given only when it can be shown that due diligence to produce the witness[] was not exercised." *People v Allen*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 342999); slip op at 10.

The record discloses that the trial court did not abuse its discretion by determining that the prosecution made diligent, good-faith efforts to secure Tamika's presence at trial. Detroit Police Detective Johnell White explained during his testimony that before July 23, 2018, Tamika had been cooperative in attending scheduled court dates, giving the police and the prosecution no reason to believe that she would avoid attending court. Tamika even reached out to Detective White during jury selection to ask for a status update on how the proceedings were progressing. Once Detective White became aware that Tamika would not be attending trial, he and other

---

(b) **Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former Testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

-12-

members of his unit undertook efforts to identify her location, including by checking local hospitals, morgues, and her place of employment. Detective White also visited Tamika's home and spoke to her grandmother and other relatives, and followed up on information he was given to attempt to determine Tamika's whereabouts. The test for due diligence is one of reasonableness, and depends on the facts and circumstances of each case, and the court is to consider the reasonableness of the steps actually undertaken to locate the witness, not whether more stringent steps could have been taken. *Bean*, 457 Mich at 684. The record supports the trial court's determination that the prosecution and the police exercised due diligence in attempting to locate and produce Tamika for trial. Having concluded that the prosecution exercised due diligence to secure Tamika's presence, the court's decision to not give a "missing witness" instruction fell within the range of reasonable and principled outcomes. *Allen*, ___ Mich App at ___; slip op at 10; *Everett*, 318 Mich App at 518.

Affirmed.

/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly
/s/ Thomas C. Cameron