# Court of Appeals, State of Michigan

## ORDER

People of MI v Tyrone Rogers

Docket No.  336000

LC No.      15-00559-FC

David H. Sawyer
Presiding Judge

Michael J. Kelly

Brock A. Swartzle
Judges

The Court orders that the December 10, 2020 opinion is VACATED, and a new opinion is attached.

_____
Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

December 17, 2020
Date

_____
Chief Clerk

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TYRONE ROGERS,

      Defendant-Appellant.

FOR PUBLICATION
December 10, 2020
9:00 a.m.

No. 336000
Muskegon Circuit Court
LC No. 15-000559-FC

Before: SAWYER, P.J., and M. J. KELLY and SWARTZLE, JJ.

SWARTZLE, J.

A criminal defendant bears a heavy burden when seeking a new trial based on newly discovered evidence. This is especially the case when the newly discovered evidence consists of recanting statements that are largely hearsay, and even more so when the recanting statements are themselves recanted. But, a heavy burden does not mean an impossible one.

A jury convicted defendant of one count of sexual assault against the complainant, his teenage biological daughter. The trial came down to a "he said/she said" credibility contest. The complainant subsequently recanted her testimony on multiple occasions, including in a video, but she later testified that her recanting statements were lies. The complainant did, however, admit under oath that she made similar allegations of sexual assault against her adoptive father and brother, and that those allegations were false. We conclude that a reasonable juror could find the new evidence credible, and when all of the available record evidence is considered, a different outcome on retrial is probable. We therefore reverse the trial court's denial of defendant's motion for new trial and remand for further proceedings, as more fully explained below.

## I. BACKGROUND

### A. INITIAL TRIAL AND APPELLATE PROCEEDINGS

Defendant was tried by jury on two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b), involving TC. Defendant is TC's biological father, but his parental rights to her were terminated when she was an infant. Stanley Cunningham, Sr. and Christine Cunningham adopted TC when she was 18 months old. TC has an older half-sister, DR, who also

testified at trial (they have the same biological mother). Given the number of witnesses in this case who share the same last names, we will often use a first name when referring to a particular adult witness.

TC testified that she reached out to defendant in 2014 to establish a relationship, and Christine permitted her to visit defendant on occasion. In May 2015, when TC was 15 years old, she spent time with defendant while Christine was at a church conference. TC did not recall what she was wearing, but she did remember that during this visit, defendant removed her "bottom clothing"; defendant removed his "bottom clothing"; and both defendant and TC were naked from the waist down. Defendant then held her by the neck, threw her to the ground, and inserted his penis into her vagina. Defendant purportedly said something to TC about having his children, which would be TC's biological siblings. TC could not recall whether the assault lasted "a few seconds" or "a matter of minutes," and she did not remember whether she screamed during the assault or where it occurred in the house. TC testified that she did not visit defendant again after this May 2015 assault.

TC subsequently clarified that this was actually the second time that defendant had sexually assaulted her. As to the alleged earlier assault, TC did not recall when it took place or whether defendant took her clothes off. TC initially testified that she did not recall whether defendant's girlfriend, Tara Rainwater, was present, but then clarified that Tara was there and that defendant told her to go into another room before he assaulted TC. TC testified that she did not call for help because Tara "knew it was going on," but as to other details, TC could "barely remember" anything about the assault. When asked again about what defendant told her regarding siblings, she could not recall whether he said this during the first or second assault.

TC claimed at trial that she first disclosed the May 2015 assault to DR. Although she did not recall precisely when she told DR, she knew that it was before she told Christine in August 2015. TC explained that she did not disclose the assault immediately because she was afraid of defendant. He purportedly threatened her and was "talking about doing something to [her] family." She could not recall, however, whether defendant made these threats after the first or second assault.

DR also testified at trial. She claimed that her biological mother dated defendant in the mid-1990s when DR was six or seven years old. In August 2015, TC disclosed something to her about defendant that made her upset. DR explained, "I been through the same thing and I never wanted her to go through any of that." Specifically, DR testified that, when she was younger, defendant sexually assaulted her. She could not recall how many times defendant did this, though at least "once for sure." She testified that she reported the abuse to the Child Abuse Council. (Although not brought out at trial, a family court judge had found the allegations of sexual abuse not credible.)

The prosecutor called Christine to the stand. She confirmed that TC told her that defendant had sexually assaulted her, and she told the police the next day. According to Christine, TC suffered from reactive attachment disorder ("RAD") from the time she was an infant. TC took medication for RAD, but when she missed her medication, TC engaged in "wild behavior," and was loud and uncontrollable. When she testified at trial, TC admitted that she had not taken her medication for several days.

Two experts also testified for the prosecution. Dr. Yvonne Mallon, a child-abuse pediatrician at the Ottawa County Children's Advocacy Center, testified as an expert in child-abuse pediatrics. Dr. Mallon obtained TC's medical history and performed a medical examination on her. TC described penile-vaginal penetration, though she did not mention bleeding or pain. The medical examination was normal; there was a "small notch" or "divot" on TC's hymen, but this was "nonspecific"—it could have been from a sexual injury or just normal development. Based on the history provided by TC, Dr. Mallon testified that she suspected pediatric sexual abuse. In addition, Dianne Adams, a psychotherapist, testified as an expert in child-sexual abuse. She explained to the jury the theory of delayed disclosure and testified that she did not notice any "red flags" during her forensic interview of TC.

Defendant called Tara to testify in his defense. The two were no longer dating, but she recalled that when they were together, TC would call defendant every few weeks and she visited him several times. Tara denied knowing anything about a sexual assault of TC or that defendant told her to leave the room when he was with TC.

After the close of proofs, the jury convicted defendant of one count of CSC-I, though it acquitted him of the other. The trial court sentenced defendant as a fourth-offense habitual offender to a term of 29 to 48 years in prison. Soon after, defendant moved for a new trial or an evidentiary hearing, arguing that he received ineffective assistance of trial counsel. The trial court held a hearing and allowed defendant's trial counsel to testify. The trial court subsequently denied the motion.

Defendant appealed as of right. While on appeal, defendant moved for a remand so that he could seek a new trial based on newly discovered evidence. He supported his motion with, among other things, an affidavit by TC in which she recanted her allegations of sexual assault. In September 2018, this Court granted the motion and remanded the matter so that defendant could seek a new trial or other relief from judgment. *People v Rogers*, unpublished order of the Court of Appeals, entered September 18, 2018 (Docket No. 336000).

## B. TRIAL-COURT PROCEEDINGS ON REMAND

On remand, defendant moved for a new trial or other relief from judgment. The prosecutor opposed the motion, noting that there were inconsistencies in TC's affidavit and suggesting that the affidavit was the result of undue influence. The trial court held a hearing on the motion in November 2018 and determined that it would need to take additional evidence. The trial court's proceedings lasted until July 2020. It appears from the record that TC's refusal to cooperate caused most, if not all, of the delay. In fact, the trial court procured TC's testimony only after it had her arrested on a material-witness warrant.

## 1. FIRST EVIDENTIARY HEARING

The first day of hearings took place in March 2019. Both Stanley and Christine testified. Christine explained to the trial court that, shortly after defendant's criminal trial, TC accused Stanley and their son, Kawawn, of having sexually assaulted her. TC claimed that Christine stood by the door and listened while Stanley raped TC. When she made these allegations, TC was in jail for domestic violence against the Cunninghams. The allegations were investigated, and no further

action was taken. Sometime after this, the Cunninghams told TC that she could not live with them any longer.

James Rogers, pastor of a local church, testified that defendant was his older brother. He stated that his nephew, Robert Lee Howell, called him sometime after the trial and asked him to come over to his home. (In a subsequent hearing, Robert testified that his name is "Robert Rogers.") When Pastor James arrived, Robert was on the phone, and he indicated that he was speaking with TC. Robert said that TC had to leave the home where she was staying and asked whether they could pick her up. Pastor James agreed, but asked Robert to go with him because he did not want to be alone with TC.

Pastor James testified that, as TC got into the backseat of his SUV, she apologized to him for " 'lying on my dad.' " Pastor James said that he asked for permission to record her statement. The trial court found that TC was unavailable to testify as a witness and admitted the video recording of her statement. In the video, TC tells her uncle that she had been "influenced" and "misled" by DR, and that her allegations that defendant choked and raped her were lies. After being prompted by her uncle, TC also agrees that she brought this up when she got into the SUV and consented to be videotaped.

Pastor James testified that he called defense counsel right away and arranged for TC to meet with counsel approximately two weeks later. TC signed the affidavit filed in support of defendant's motion on the day that she met with counsel. According to Pastor James, TC told him that DR put her up to accusing defendant of rape, and indicated that DR had threatened her. TC also told him that she had trouble on the witness stand because she was trying to remember what DR had told her to say.

Pastor James explained that he took TC to stay at the home of Robert's sister, but it was only "four or five hours" before he received a call because a person at the home did not want TC staying there. Pastor James then picked up TC and drove her to the home of his sister, Patricia Rogers. TC lived with Patricia for a short time, but Patricia eventually asked TC to leave because they could not get along. Pastor James' wife arranged for TC to move into a homeless shelter.

Patricia and Melanie Albring, a member of Pastor Rogers' church, also testified. They both claimed that TC recanted her criminal trial testimony. Patricia further testified that TC blamed her false testimony on DR's threats against her.

## 2. INTERIM PROCEEDINGS

In April 2019, defendant moved for an *in camera* review of Child Protective Services' ("CPS") records involving TC. Defendant alleged that the records would show that TC made allegations of sexual abuse against her biological mother, which CPS had investigated and determined to be meritless.

The trial court held a hearing on the motion, and defense counsel represented that CPS had investigated TC's biological mother based on TC's claims of sexual abuse. Counsel further represented that a judge had determined that TC's allegations were meritless and that TC could not be believed.

In analyzing whether to allow discovery of the CPS records, the trial court recognized that defendant's argument for a new trial had expanded to encompass all the evidence indicating that TC had made false allegations of sexual abuse. The trial court determined that defendant should be allowed another day to present his evidence and held that it would review the CPS records *in camera* to determine whether any portion of the records should be disclosed to the defense. The trial court also expressed concern that the parties had not been able to produce TC to testify. It opined that it might be necessary to issue a material-witness warrant for TC. The trial court subsequently ordered that one record from the CPS records had to be released to the defense—in this record, TC admitted to a trial-court referee that she had made a false allegation of physical abuse against Kawawn.

### 3. CONTINUED EVIDENTIARY HEARING

The trial court continued the evidentiary hearing in May 2019. At the start of the hearing, the trial court heard that TC was avoiding testifying in court. Robert testified at the hearing, and his testimony was consistent with Pastor James' earlier testimony. Defendant's sister, Earnestine Gaines, and niece, Connie Sullivan, also testified, and they both said that TC recanted her allegations of sexual assault against defendant.

Defense counsel called Tara Rainwater to testify. She recalled that about the same time when TC accused defendant of raping her, TC came to their home for a visit. During the visit, TC became upset about not getting her way on some matter. She then packed her things and became loud and angry. Tara said that she and defendant decided that TC needed to leave and told her so. According to Tara, on the drive back to the Cunninghams' home, TC became angry again because someone had called CPS to report that she was living with DR instead of living with the Cunningham family.

After Tara testified, the trial court discussed the efforts to find TC and stated that TC was the "indispensable link" in the matter. The trial court was reluctant to have TC arrested, but it felt that a material-witness warrant might be needed.

### 4. MORE INTERIM PROCEEDINGS

On July 25, 2019, defendant moved to adjourn the next evidentiary hearing. Defense counsel asserted that TC was talking with the Cunningham family again, and Christine was not cooperating with efforts to find TC. Defense counsel also complained that Kawawn had been avoiding service. Defense counsel sought to subpoena Christine, Kawawn, and TC; after hearing from a private investigator, the trial court signed a material-witness warrant for TC.

The trial court held another hearing in September 2019. Defense counsel informed the trial court that she had sent a subpoena to TC and had spoken to her on the phone. She stated that TC told her that she would appear at the hearing; however, TC did not appear. Pastor James then testified generally about his efforts to contact TC and get her to appear in court. He related that he had not been able to contact TC in approximately a year. He stated that she had become upset with him and had stopped talking to him. The last he had heard was that TC was again living with Christine.

The next hearing was held in October 2019. At that hearing, defense counsel asserted that she was "95 percent certain" that TC was staying with Christine. She stated that both Christine and TC had failed to comply with the subpoenas for them to appear at the previous hearing. The prosecutor opined that it spoke volumes that TC was no longer cooperating with defendant's family, when she was earlier willing to tell just about everybody that she lied. Defense counsel responded that she agreed but came to the opposite conclusion: "If she has nothing to hide, why isn't she here?"

### 5. TC'S TESTIMONY

In December 2019, the trial court held an evidentiary hearing the day after it learned that TC had been arrested on the material-witness warrant. The trial court appointed an attorney to represent TC and ensured that she was advised of her Fifth-Amendment rights before testifying under oath.

TC denied that DR had threatened her to set up defendant on a sexual-assault charge. She also denied that she had lied at defendant's criminal trial, and she generally denied or did not recall telling defendant's family members and others that she lied at the trial. Although she acknowledged making the video with Pastor James and later signing the sworn affidavit—in both of which she recanted her trial testimony and allegations of rape against defendant—she explained that she lied in both instances. She reaffirmed her trial testimony that defendant sexually assaulted her.

With respect to the video, TC explained that she was homeless at the time and that Pastor James was helping her. Eventually, she came to believe that the only way he would continue helping her was if she would say that defendant did not rape her. She claimed that she was pregnant and did not want to be on the street. As soon as she informed Pastor James that she would not testify in court, he dropped her off at a homeless shelter. TC claimed that she refused to go to court because she did not want to accuse DR of doing things that DR did not do. She explained: "I just know I wasn't fittin to come up here on this stand and lie and say that this man didn't rape me when I was 14 years old." TC stated that all of the other family members who testified at previous hearings lied on the witness stand. After this brief period of questioning, the trial court placed TC on a tether and scheduled another hearing.

During the final hearing, TC denied that she had testified at a court hearing and accused Kawawn of throwing her out of a moving car. She further denied that she had told anyone that she had lied about Kawawn throwing her out of a car because her parents took her phone. She did not recall relating the story about Kawawn to a trial-court referee.

After obtaining immunity with regard to her accusations against the Cunningham family, TC admitted that, shortly after defendant's trial, she had reported to police officers that Stanley had entered her bedroom and sexually assaulted her. She admitted that she had told police officers that Christine had leaned against the door and listened while Stanley sexually assaulted her. But she confirmed that those allegations were not true. Regarding Kawawn, TC admitted that she told police officers that he sexually assaulted her on two occasions. During the first, he allegedly choked her while raping her; during the second, he allegedly threw her to the floor, pinned her arms, and raped her. TC likewise confirmed that neither of these allegations were true. TC

explained that she had made these false accusations against the Cunninghams because she had a fight with Christine, who had called the police, resulting in TC's arrest for domestic violence.

With respect to her earlier recantations involving defendant, TC agreed that she had spoken to defense counsel and told her that DR and DR's boyfriend had threatened to kill her or "pimp" her out if she did not falsely accuse defendant of rape. But TC denied at the hearing that this was a true statement. TC claimed that DR did not force her to do anything, and that she loved DR. TC further denied that she had told Pastor James in her recorded statement that DR had threatened her. (In the video, TC claims that DR "influenced" her into "lying" about the sexual assault.)

TC testified that she agreed to sign the affidavit because she was pregnant and had nowhere to go. She said that no one told her explicitly that they would not help her unless she helped get defendant out of prison, but it was clear to her that this was the case. Pastor James and others testified again and offered a version of events at odds with TC's testimony.

## 6. THE RENEWED MOTION AND DECISION

Defendant subsequently filed a renewed motion for a new trial. In his renewed motion, defendant noted that there was a considerable amount of new evidence that the jury in his criminal trial had not heard and that the new evidence implicated TC's credibility. Namely, TC admitted in an affidavit and other statements that she had lied when she testified that defendant had sexually assaulted her. Defendant noted as well that TC claimed that DR and DR's boyfriend had threatened to kill her or force her into prostitution if she did not accuse defendant. Defendant made an offer of proof that DR had since been convicted of accepting the earnings of a prostitute and that DR's boyfriend had been killed in a gunfight with police officers during a raid by the FBI's child-exploitation task force.

Defendant argued that the trial court should grant him relief under MCL 770.1, MCR 6.431, or MCR 6.502, because the new evidence showed that there had been a miscarriage of justice and that he was actually innocent. He maintained that TC's statements that she had lied were credible and, in light of the weakness of her trial testimony, that he was entitled to a new trial under *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003), and *People v Johnson*, 502 Mich 541; 918 NW2d 676 (2018). He also cited evidence that TC had accused other family members of sexually assaulting her, which accusations were found to be not credible and, in fact, TC had admitted were lies. Defendant argued that TC's other false accusations were remarkably similar to the accusations that she made against defendant. Finally, he noted that TC had refused to come forward and was only in court because a private investigator found her living with DR and she was arrested on a material-witness warrant. Defendant asked that the trial court grant his motion for a new trial.

On July 14, 2020, the trial court issued an opinion and order denying defendant's motion. The trial court noted that defendant's motion relied on two broad categories of evidence: (1) the evidence that TC had made statements accusing others of physically or sexually assaulting her; and (2) the evidence that TC had told others that she lied when she testified that defendant had sexually assaulted her. The trial court analyzed these categories separately.

The trial court first noted that TC's allegations of sexual assault by the Cunninghams occurred after defendant's criminal trial. Because that evidence did not exist prior to the trial's conclusion, the trial court determined that the evidence could not support a motion for new trial based on newly discovered evidence. As the trial court explained, "The *Cress* framework simply does not apply to them." The trial court agreed that TC had made her statement about lying about her brother throwing her out of a car before defendant's criminal trial, but it concluded that defendant could have discovered that evidence with reasonable diligence. The trial court also questioned whether the evidence involving the car would be admissible but, in any event, the evidence would not make a different result probable on retrial. More specifically, the trial court found it compelling that the jury had acquitted defendant on one count of CSC-I, which demonstrated that the jury had evaluated TC's testimony "critically."

The trial court next addressed TC's statements after defendant's trial in which she told others that she had lied at trial. The trial court recognized that such recanting statements are traditionally viewed with suspicion. Moreover, the evidence ranked low, in the trial court's estimation, because it was "not even the victim's own recantation. It [was] someone else saying that she [was] recanting." The trial court found that TC had made the recanting statements, but it further explained that these statements could be "reconciled" with TC's testimony to the contrary—in the trial court's view, TC "was saying what she thought she needed to say to obtain help for herself and her baby." Similarly, the trial court concluded, "The court believes the victim's testimony, that she was willing to do or say what she felt she needed to do, true or not true, to get the assistance she needed." The trial court further concluded that defendant had failed to produce TC for over a year. It was also skeptical that TC's post-trial statements would be admissible at a new trial.

With respect to our Supreme Court's decision in *Johnson*, the trial court found TC's testimony at trial not inherently weak, and so the trial court did not believe that the decision was on-point. The trial court also distinguished *Johnson* because that case involved a motion for relief from judgment, rather than a motion for new trial. Finally, the trial court determined that trial counsel's failure to discover the evidence that TC purportedly told a trial-court referee that she lied about her brother throwing her from a car did not amount to ineffective assistance of counsel.

Following the trial court's denial of the motion on remand, the case returned to this Court on direct appeal.

## II. ANALYSIS

On appeal, defendant raises several claims of error, including ineffective assistance of trial counsel and evidentiary errors. We need not reach these claims, however, because the trial court abused its discretion in denying defendant's motion for new trial based on newly discovered evidence.

### A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a trial court's decision on a motion for a new trial. *Johnson*, 502 Mich at 564. A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable outcomes. *Id.* This Court reviews for clear error the factual

-8-

findings underlying the trial court's application of the law. *Id*. at 565. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court erred. *Id*.

## B. MOTION FOR A NEW TRIAL

This Court granted defendant's motion to remand this case to the trial court so that he could move for a new trial based on newly discovered evidence. *People v Rogers*, unpublished order of the Court of Appeals, entered September 18, 2018 (Docket No. 336000). On remand, defendant moved for a new trial under MCL 770.1, MCR 6.431, or MCR 6.502, on the ground that he had discovered evidence that TC had committed perjury at his original trial.

Under MCL 770.1, a trial court "may grant a new trial to the defendant, for any cause for which by law a new trial may be granted, or when it appears to the court that justice has not been done, and on the terms or conditions as the court directs." Although MCL 770.1 allows a trial court to grant a new trial "when it appears to the court that justice has not been done," this Court previously interpreted the trial court's authority under that statute to be limited to "those circumstances where the defendant has been denied a fair trial." *Wayne Co Prosecutor v Recorder's Court Judge*, 148 Mich App 320, 324; 384 NW2d 47 (1985), remanded 429 Mich 893 (1988).[1] This Court explained that a trial court cannot use MCL 770.1 to accomplish indirectly what it could not accomplish directly. *Id*. at 325. Additionally, this Court has held that our Supreme Court superseded MCL 770.1 with the adoption of MCR 6.431. See *People v McEwan*, 214 Mich App 690, 693 n 1; 543 NW2d 367 (1995). Under MCR 6.431(B), a trial court may grant a defendant's motion for a new trial "on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice." Consequently, the proper inquiry is whether the trial court abused its discretion when it denied defendant's motion for a new trial under MCR 6.431(B), premised on newly discovered evidence.

A brief note before proceeding further. Because defendant moved for a new trial under MCR 6.431(B), the trial court stated that it would focus on case law involving motions "styled as motions for new trials," rather than motions for relief from judgment under MCR 6.502. This statement is a bit unclear, as several of the binding and relevant opinions of this Court and our Supreme Court involve requests for new trial made in a motion for relief from judgment. There are certainly differences between a motion for new trial under MCR 6.431 and a motion for relief from judgment under MCR 6.502, including, among other things, additional procedural prerequisites for obtaining relief under the latter.

With that said, in the context of a criminal defendant's request for a new trial based on newly discovered evidence, the four-part standard set forth by our Supreme Court in *Cress*, 468 Mich at 692, applies to that request, whether it is made in a motion for new trial under MCR 6.431 or a motion for relief from judgment under MCR 6.502. Compare *People v Rao*, 491 Mich 271, 279-281; 815 NW2d 105 (2012) (applying *Cress* to the defendant's motion for new trial) with *People v Grissom*, 492 Mich 296, 319; 821 NW2d 50 (2012) (applying *Cress* to the defendant's

---

[1] Decisions published before November 1, 1990, are not binding on this Court. See MCR 7.215(J)(1). Those decisions, however, are entitled to deference and should not be casually disregarded. See *People v Bensch*, 328 Mich App 1, 2 n 6; 935 NW2d 382 (2019).

request for a new trial made in a motion for relief from judgment). Likewise, cases interpreting and applying *Cress*'s four-part standard are relevant to the question in this case—whether defendant is entitled to a new trial based on newly discovered evidence—regardless of whether the particular case involved a motion for new trial or motion for relief from judgment.

The only relevant difference, under the facts of this case, between a motion for a new trial under MCR 6.431 and a motion for relief from judgment under MCR 6.502 is procedural. Defendant could not file a motion for relief from judgment because his claims were still on appeal in this Court. See MCR 6.501; MCR 6.508(D)(1). The proper procedure was to ask this Court for the opportunity to file a motion for a new trial in the trial court. See MCR 6.431(A)(2); MCR 7.208(B); MCR 7.211(C)(1). Defendant did that, and this Court granted the request.

### C. WHAT CONSTITUTES "NEWLY DISCOVERED EVIDENCE"?

Returning to the matter at hand, our Supreme Court has long recognized that a new trial may be warranted on the basis of newly discovered evidence. See *Rao*, 491 Mich at 279. Requests for a new trial have traditionally been looked at with disfavor, however, because courts do not want the parties to submit evidence in "installments." As the *Rao* Court explained, "The policy of the law is to require of parties care, diligence, and vigilance in securing and presenting evidence." *Id.* at 280 (cleaned up). Accordingly, the cases where a reviewing court "has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between." *Id.* (cleaned up).

And yet, a judicial avenue must remain open for the rare case where, after new evidence is discovered, justice necessitates a new trial. In *Cress*, our Supreme Court set forth the roadmap for courts to travel when considering whether justice requires a new trial. Under *Cress*, a defendant who seeks a new trial based on newly discovered evidence must satisfy each of the following four conditions: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Cress*, 468 Mich at 692 (cleaned up).

The first matter to resolve on appeal is what constitutes "newly discovered evidence" for purposes of defendant's motion for new trial. Generally speaking, the request for new trial must be grounded upon the recent discovery of evidence of an asserted thing or event—i.e., a proposed fact—that existed or took place *prior* to the conclusion of the trial. Things or events that came into existence or took place *after* trial do not generally qualify as grounds for a new trial because they could not have been the subject of testimony at trial. See *Bishop v Gaudio*, 266 Mich 267, 270; 253 NW 292 (1934) (concluding that the findings from a medical examination after trial did not constitute a "showing made one of newly discovered evidence"); *People v Burton*, 74 Mich App 215, 222-223; 253 NW2d 710 (1977) (recognizing that newly discovered evidence must be evidence that existed at the time of the trial, but that could not have been discovered with reasonable diligence); see also *United States v Hall*, 324 F3d 720, 723 (CA DC, 2003) (concluding that events and transactions occurring after trial could not justify a new trial under FR Crim P 33); *United States v Beran*, 546 F2d 1316, 1319 n 1 (CA 8, 1976) (same); *United States v Bolden*, 355 F2d 453, 461 (CA 7, 1965) (same).

Here, defendant relies on evidence of several proposed facts in support of his motion for new trial: (1) evidence that TC lied during her trial testimony about defendant raping her; (2) evidence that TC lied to authorities about her brother pushing her from a car; and (3) evidence that TC lied to authorities about her adoptive father and brother raping her while her adoptive mother knowingly acquiesced. Of the three, only (1) and (2) are about alleged things or events that existed or occurred prior to the conclusion of the trial, i.e., false testimony during trial and being pushed from a car prior to the date that the trial concluded. We agree with the trial court that evidence that TC lied about her adoptive father and brother raping her, and her adoptive mother's knowing acquiescence, does not qualify as "newly discovered evidence" for purposes of defendant's motion for new trial. TC did not make the allegations about these purported events until after the trial concluded, and there is nothing to suggest that TC claimed that these purported events occurred prior to the trial's conclusion. In other words, nothing about these false allegations could have conceivably been the subject of testimony at trial. *Burton*, 74 Mich App at 222-223. But, as explained later, this does not mean that evidence of (3) is irrelevant to the *Cress* analysis.

With respect to (2), we also agree with the trial court that TC's admission that she lied about her brother pushing her from a car has little relevance to defendant's motion for new trial. The subject matter of the trial (sexual assault) and the new evidence (pushed from a car) conceptually share almost nothing in common, and the subject of each allegation is different (biological father versus adopted brother). Other than showing the bare fact that TC was willing to lie about a family member, this particular evidence involving the brother does not make a determination of whether defendant sexually assaulted TC more or less probable than it would be without the evidence.

Our focus turns then to evidence that TC lied during her trial testimony about defendant assaulting her, i.e., evidence that TC recanted her story. Traditionally, courts have considered recantation evidence with suspicion. As our Supreme Court explained nearly a hundred years ago, "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of criminal law know well its untrustworthy character." *People v Van Den Dreissche*, 233 Mich 38, 46; 206 NW 339 (1925) (cleaned up). This Court recently reiterated this suspicion: "As a rule, the court is not impressed by the recanting affidavits of witnesses who attempt to show that they perjured themselves at the trial." *People v Norfleet*, 317 Mich App 649, 661; 897 NW2d 195 (2016) (cleaned up). Nevertheless, the "discovery that testimony introduced at trial was perjured may be grounds for ordering a new trial." *People v Barbara*, 400 Mich 352, 363; 255 NW2d 171 (1977); see also *People v Smallwood*, 306 Mich 49, 54-55; 10 NW2d 303 (1943); *People v Mechura*, 205 Mich App 481, 483; 517 NW2d 797 (1994).

In current form, defendant's recantation evidence consists largely of hearsay statements. The testimony by family members and others of what TC allegedly told them is classic hearsay under MRE 801. The video was admitted into evidence by the trial court because TC was unavailable at that particular hearing, but it is uncertain whether the video could be introduced as substantive, nonhearsay evidence at a future retrial. See, e.g., MRE 803(5),(24); MRE 804(b)(3),(7). And the sworn affidavit is not a "prior statement" for purposes of MRE 801(d)(1), *Barnett v Hidalgo*, 478 Mich 151, 160; 732 NW2d 472 (2007), nor is it an "admission by a party-opponent" for purposes of MRE 801(d)(2), *People v Carson*, 87 Mich App 163, 169; 274 NW2d 3 (1978). As it was with the trial court, it is not clear to this Court how defendant's evidence, in

its current form, could be used as substantive evidence of recantation at retrial. At best, it seems that this evidence could be used to impeach TC's "recantation of her recantation," similar to how it was used during the remand hearing. See *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995) ("The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the content of the statement."); see also 3 Wright, King & Klein, Federal Practice & Procedure (3d ed), § 557.1, p 579 ("FPP") ("In that instance [when the witness recants her recantation statement,] the recantation statement would be merely impeaching evidence, rather than substantial evidence in the defendant's favor."). With respect to the remand hearing, TC's testimony during the hearing could be used as substantive evidence at a subsequent retrial if it meets the requirements of MRE 801(d)(1) (prior statement of witness) or 804(b)(1) (declarant unavailable/former testimony), although the testimony mainly consisted of TC admitting that she made recanting statements but then asserting that those statements were lies, i.e., the statements were used to impeach TC's credibility.

Prior to *Grissom*, some courts considered impeachment evidence insufficient to support a motion for new trial based on newly discovered evidence. As the Supreme Court put it in *Barbara*, "Generally, too, where the new evidence is useful only to impeach a witness, it is deemed merely cumulative." *Barbara*, 400 Mich at 363. This changed with *Grissom*, however, where our Supreme Court made clear that impeachment evidence alone can be a sufficient basis for a new trial as long as the four-part test from *Cress* is satisfied. *Grissom*, 492 Mich at 321. Thus, the fact that defendant's newly discovered evidence consists of impeachment evidence is not a bar to appellate relief; therefore, we need to consider this impeachment evidence within the framework of *Cress*.

### D. *ALL* OF THE EVIDENCE THAT WOULD BE AVAILABLE AT RETRIAL

We have little trouble concluding that the first three conditions of *Cress* are met here. One, TC's statements in the video and sworn affidavit, and her alleged recantation statements to others, all were made after the trial and therefore were newly discovered. Two, although TC's credibility was attacked by defense counsel at trial, there was nothing in the form of recantation statements that could have been used for impeachment, and therefore the impeachment evidence is not merely cumulative. And three, there is nothing to suggest that TC recanted her allegations prior to or during the trial, and therefore the impeachment evidence could not have been, using reasonable diligence, discovered and used at trial.

With respect to the fourth condition, we leave as an open question whether the recantation evidence alone would be sufficient for a new trial. We are mindful that, as explained earlier, recantation evidence is usually (and correctly) met with skepticism when considering a request for a new trial. And here, we have recantation-within-recantation, as TC admitted on remand that she made recanting statements in the video and sworn statement, but adamantly asserted that those recanting statements were themselves lies. If the statements of TC recanting—compared with the evidence offered at the original trial and TC's testimony on remand disavowing the recanting statements—were all that this Court had to consider on defendant's request for new trial, then it is quite likely that the motion would fail. But under our Supreme Court's recent opinion in *Johnson*, defendant is not limited to this evidence, contrary to the trial court's decision below.

In *Johnson*, our Supreme Court clarified two important points about how motions for new trial based on newly discovered evidence are to be analyzed. First, the trial court is not acting as the "ultimate fact-finder," because the question is not whether to dismiss the criminal case but whether to retry the defendant. *Johnson*, 502 Mich at 567. Given this, when analyzing the evidence offered for retrial, the trial court must consider "whether a *reasonable juror* could find the [evidence] credible on retrial." *Id.* While it remains within the trial court's discretion to evaluate a witness' credibility on a motion for new trial, *Cress*, 468 Mich at 692, the trial court must do so while "contemplating a future trial and the role of a future fact-finder," *Johnson*, 502 Mich at 568. As the Court explained, "[I]f a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court might decide, were it the ultimate fact-finder." *Id.*

Second, and of particular importance here, the *Johnson* Court elaborated a subtle, but material, expansion of the evidence that must be considered under the fourth *Cress* condition. Prior to *Johnson*, the evidence that had to be considered on a motion for new trial based on newly discovered evidence consisted of two distinct classes: (1) evidence presented at the original trial; and (2) the newly discovered evidence. See, e.g., *Grissom*, 492 Mich at 321 (majority opinion); *id.* at 342 (MARKMAN, J., concurring) ("Any evidence that falls outside these classes is plainly beyond the scope of the *Cress* process."); but see *id.* at 365 & n 54 (ZAHRA, J., concurring in part and dissenting in part) (noting that the limitation to the two classes of evidence was at odds with Justice MARILYN KELLY's concurring opinion as well as *Cress*, where the trial court granted the prosecutor's motion to reopen proofs on the defendant's motion for new trial).

In *Johnson*, however, our Supreme Court expanded the second class of evidence beyond just the "newly discovered evidence" to include now *all* of "the evidence that would be presented on *retrial*." *Johnson*, 502 Mich at 571. As the *Johnson* Court clarified, "Thus, the evidence that must be taken into consideration when assessing a claim of newly discovered evidence is not simply the evidence presented at the original trial, but also the evidence that would be presented at a new trial." *Id.* This includes, but importantly is not limited to what, strictly speaking, would qualify as "newly discovered evidence" to support a motion for new trial.

To illustrate how this clarification expands the second class of evidence, consider *Johnson* itself. As explained earlier, "newly discovered evidence" for purposes of a motion for new trial is evidence about some purported thing or event that existed or took place prior to the original trial's conclusion. Recantation evidence falls within this category because it is evidence of false testimony given during the trial. Similarly, new, previously unknown eyewitness testimony falls within this category because it is evidence about an event (i.e., the crime) that occurred before the trial. In *Johnson*, the defendant offered both of these types of "newly discovered evidence" in support of the request for new trial.

In addition, however, the prosecutor in *Johnson* argued, and the trial court had agreed, that the new eyewitness was not credible based in part on that witness' conviction for perjury. The perjured testimony and subsequent conviction occurred in an unrelated case years after the defendant's original trial. Strictly speaking, therefore, the perjury conviction was not "newly discovered evidence" for purposes of the defendant's request for a new trial. And yet, if the defendant were granted a retrial, there was little doubt that the prosecutor would have attacked the credibility of the new eyewitness with the perjury conviction. Given this, the *Johnson* Court

acknowledged that it was appropriate for the trial court to consider this evidence of a post-trial fact when evaluating the defendant's request for new trial. See *id.* at 570. Accordingly, both the description of the standard and how the standard was actually used in *Johnson* makes clear that, when evaluating a motion for new trial based on newly discovered evidence, the court must consider the evidence admitted at the original trial and *all* of the *record* evidence that has come to light to-date that could be used at the retrial. Cf *id.* at 577 n 17 (noting that one of the defendants could not use the recanting evidence "as an *independent* ground for relief" because he had raised it in an earlier motion for relief from judgment, but the evidence could be considered by the court "*in the context of* the claim [the defendant] is now raising"); see also *Williams v United States*, 500 F2d 105, 108 (CA 9, 1974) (reversing the district court and granting a new trial by reason of tainted testimony of a witness who was subsequently convicted of perjury involving similar circumstances); *United States v Segelman*, 83 F Supp 890, 893 (WD PA, 1949) (granting a new trial where the key witness had been convicted of perjury at the time of trial, but his appellate rights had not yet been extinguished at that time, and therefore defense counsel was not permitted to impeach the witness with the conviction; the appellate rights were extinguished subsequent to the defendant's conviction).

Applying *Johnson* to the current case, we conclude that the trial court erred in two respects. With respect to its credibility determinations, the trial court did not distinguish between "what a reasonable juror might make of the testimony" versus "what the trial court might decide, were it the ultimate fact-finder." *Johnson*, 502 Mich at 568. The trial court reconciled conflicting testimony and concluded that TC had a particular motivation for making recanting statements—to get help for herself and her baby—but it did not consider what a reasonable juror could make of the conflicting testimony.

The trial court also erred by failing to consider the evidence of false allegations against the Cunninghams. Were defendant to be retried, there is little doubt that defense counsel would seek to undermine TC's credibility with the evidence of her false allegations against the Cunninghams, including her sworn testimony admitting that the allegations were false. TC's testimony admitting that she lied could be used not just for impeachment purposes, but as a "prior statement of witness" under MRE 801(d)(1)(A), the testimony could also be used as substantive evidence of motive and scheme, plan, or system under MRE 404(b). See *Grissom*, 492 Mich at 316.

And judged from the perspective of the time of retrial, there seems little reason to keep this evidence out. The evidence is not subject to the rape-shield statute. *People v Jackson*, 477 Mich 1019; 726 NW2d 727 (2007). In fact, it has long been recognized by Michigan courts that, in defense against a charge of sexual assault, "the defendant should be permitted to show that the complainant has made false accusations of rape in the past." *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984). Even though TC made the false accusations against the Cunninghams after the purported assault by defendant, the accusations will have occurred prior to TC's anticipated testimony at a future retrial. We agree with Justice MARILYN KELLY's observation in her concurring opinion in *Grissom* about the relevant timing on this issue:

> The dispositive question regarding the timing of a past false rape accusation and its
> admissibility is not when a false rape allegation occurred relative to the case at bar.
> Rather, given a defendant's Sixth Amendment right to confrontation, it is sufficient
> that any prior false allegation occurred *before a complainant testifies at trial*. To

hold otherwise would lead to unjust results. [*Grissom*, 492 Mich at 328 n 13 (MARILYN KELLY, J., concurring) (emphasis added).]

Thus, the trial court should have considered TC's false allegations against the Cunninghams together with the newly discovered impeachment evidence and the evidence used at the original trial to determine whether defendant was entitled to a new trial.

### E. ON RETRIAL, A DIFFERENT RESULT IS PROBABLE

Over the span of a year, the trial court heard several days of testimony from multiple witnesses. TC made recanting statements in a video and sworn affidavit, she admitted that she made the statements, and, after being given immunity, she admitted that she made false allegations of sexual assault against the Cunninghams. Given this record, we decline to return the matter to the trial court for further proceedings, see *Johnson*, 502 Mich at 548, 565, and we now consider whether a reasonable juror could find the new evidence credible and, if so, whether a different result is probable on retrial.

We need not factor in the hearsay testimony by Pastor Rogers and others to conclude that a reasonable juror could find much of the new record evidence credible. TC admitted in sworn testimony that she made recanting statements in the video and affidavit, but she explained that those statements were actually lies. A reasonable juror could conclude that, in fact, TC told the truth in the recanting statements or, at a bare minimum, the reasonable juror could conclude that TC was willing to lie on multiple occasions about the central issue of this case. TC further admitted under oath that she made false allegations of similar sexual assaults against the Cunninghams, and from this a reasonable juror could conclude that TC was willing to falsely accuse family members of rape because she was angry with them. While a reasonable juror could conclude, as did the trial court, that TC lied in the video and affidavit to get help for herself and her baby, a reasonable juror could instead conclude that TC's recanting statements were true, similar to how she recanted her false allegations against the Cunninghams.

Because a reasonable juror could find the recanting evidence and admissions of false accusations credible (which would undermine TC's credibility with respect to her trial testimony), we consider the impact that this evidence would have on retrial. The original trial was a classic "he said/she said" credibility contest between TC and defendant. There were no other eyewitnesses who testified about the alleged assault, and the physical evidence was inconclusive.[2] DR did bolster TC's allegations with her own allegations of an earlier assault by defendant, but the testimony about that earlier assault was vague and not without its own credibility problems.

With respect to TC's trial testimony, she asserted that defendant assaulted her on two separate occasions. Her testimony about the first alleged assault was particularly weak and vague, and the jury acquitted defendant of one charge of CSC-I. As to the second alleged assault, TC's

---

[2] Dr. Mallon testified that TC's examination was "nonspecific," but then asserted that she confirmed suspected pediatric sexual abuse. This testimony was likely improper because a physician cannot opine that there was a sexual assault on the basis of a patient's history alone. See *People v Thorpe*, 504 Mich 230, 261-263; 934 NW2d 693 (2019).

testimony was more specific, identifying details about how defendant removed part of her clothes, how he held her down by the neck, and the like. But even this testimony was not without its weaknesses. For example, TC did not recall what she was wearing, and did not know if she screamed during the assault or even where it occurred in the house. What she did recall was that defendant threw her to the ground and raped her while making lewd comments that her children would be her siblings. Given the lack of other eyewitness testimony or clear physical evidence of rape, the case against defendant came down to TC's credibility as a witness.

As to the recanting impeachment evidence, there must be an "exculpatory connection" between the heart of a witness's testimony and the newly discovered impeachment evidence. *Grissom,* 492 Mich at 319. There clearly is a connection between TC's recanting statements (defendant did not rape her) and her inculpatory trial testimony (defendant did rape her). See *id.* at 317; see also *Barbara*, 400 Mich at 363-364 (stating that new discovered evidence that a witness committed perjury is particularly significant when the only evidence that an offense was committed was founded on the testimony of the individual whose credibility had been put into question). Moreover, this impeachment evidence would likely undermine TC's credibility in the eyes of a reasonable juror. Even setting aside the hearsay statements that she purportedly told to others, she asserted during her testimony that she lied in the video and she lied in a sworn affidavit. Admissions of lying about the central issue—whether the rape actually occurred—would *ceteris paribus* undermine any witness' credibility to some extent.

Additionally, TC's explanation for why she made the recanting statements is itself evidence that should be considered. See *Johnson*, 502 Mich at 572. TC claimed that she lied to Pastor James and Robert, and lied in her affidavit, because, in her view, defendant's family would not help her unless she made the statements. She conceded that no one told her this, yet she believed this to be the case. Even if a reasonable juror could believe TC's explanation for lying to Pastor James and others, that juror could nevertheless conclude that her explanation was evidence that she was willing to make false statements to manipulate others into giving her what she wanted. Stated another way, her explanation that she lied to get help from defendant's family was itself evidence that undermined her credibility because it demonstrated that she was willing to lie about serious matters to get what she wanted from others.

TC's credibility with respect to her trial testimony is further undermined when her false allegations against the Cunninghams are considered. Her allegations against defendant and those against the Cunninghams share several material features: (1) both involve family members (TC's biological father, on the one hand; TC's adoptive father and brother, on the other hand); (2) both involve similar physical acts (e.g., thrown down and then sexually assaulted); (3) both involve a female partner who purportedly knew that an assault was occurring (Tara, on the one hand; Christine, on the other hand); and (4) as a possible motive for lying, TC was said to have been angry with a family member around the time of the alleged assaults. This evidence would likely be used not just for impeachment purposes, but would also likely be used to show that TC had a motive for falsely accusing defendant—according to Tara, TC became angry when defendant told TC that she needed to leave his house and again shortly thereafter when TC learned that someone had told CPS that she was not living with the Cunninghams. See *Hackett*, 421 Mich at 348 (explaining that evidence of a motive to make a false charge of sexual assault is admissible). Moreover, the evidence might also be admissible to show that TC had a scheme, plan, or system of making false allegations of sexual assault as retribution against a family member with whom

she became angry. As the Supreme Court observed in *Grissom*, "If the witness were prepared to admit on the stand that a prior accusation of similar nature was false, it is hard to imagine good reason for excluding the evidence. Prior admitted lies of the same kind in similar circumstances could powerfully discredit the witness." *Grissom*, 492 Mich at 317.

When we consider all of the evidence that could be used at retrial—including the evidence from the original trial, TC's recanting statements, TC's explanations for why she made the recanting statements, and the evidence of false accusations against the Cunninghams—we conclude that a different result on retrial is probable. Simply put, the case against defendant rests largely, if not wholly, on TC's credibility, and given the evidence that was presented on remand, a reasonable juror could conclude that TC is not a credible witness when it comes to her allegations of sexual assault against defendant. If her testimony on this score is not credible, then the case against defendant collapses.

Accordingly, the trial court abused its discretion when it denied defendant's motion for a new trial.

## III.  CONCLUSION

As one commentator observed, "No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial." 3 FPP § 557, pp 540-541. Trials are not to be tried by the installment method, and, therefore, parties must use "care, diligence, and vigilance in securing and presenting evidence" at trial. *Rao*, 491 Mich at 280. And yet, a judicial avenue must remain open for the rare case when, after new evidence is discovered, justice necessitates a new trial.

As explained here, justice necessitates that defendant have the right to be retried. The case against him rested almost entirely on the credibility of the complainant. After reviewing the evidence used at the original trial and all of the record evidence available on retrial, it is clear that a reasonable juror could conclude that the complainant is not a credible witness with respect to her allegations of sexual assault against defendant, and, as a result, a different outcome on retrial is probable.

Accordingly, we reverse the trial court's denial of defendant's motion for new trial and remand for a new trial. Given our decision today, we need not reach defendant's remaining claims for appellate relief. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ David H. Sawyer
/s/ Michael J. Kelly

-17-