*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

CHARLES RAY SMITH,

        Defendant-Appellee.

UNPUBLISHED
March 2, 2023

No. 359817
Oakland Circuit Court
LC No. 2008-219454-FC

Before: RICK, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

In this appeal by leave granted,[1] we consider whether the trial court abused its discretion by granting defendant Charles Smith's successive motion for relief from judgment. The trial court determined that the prosecution withheld exculpatory, impeachment evidence in violation of *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963) because it did not disclose that an investigation had substantiated that Lynne Helton, a DNA analyst, had taken proficiency tests for her supervisor in 2003 and 2004. The court also concluded that under *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003), an affidavit from Karl Reich, a defense expert, was newly, discovered evidence. In his affidavit, Reich disagreed with the prosecution's expert witnesses, Melina Jackson and Lynne Helton, both of whom offered opinions estimating the time of intercourse by reference to the semen DNA samples found on and in the condom. Reich opined that such time-since-intercourse evidence amounted to "junk science." For the reasons stated in this opinion, we reverse and remand for further proceedings consistent with this opinion.

## I. BASIC FACTS

In the early morning hours of June 5, 2007, three men broke into the home of Cleveland Brown and Maurice Threlkeld. Initially, only Brown and his girlfriend, MS, were present. The men threatened to kill Brown and demanded that he give them crack cocaine. One of the men,

---

[1] *People v Smith*, unpublished order of the Court of Appeals, entered April 7, 2022 (Docket No. 359817).

whom MS identified as Jonathan Phlegm, entered the bedroom where she was and tied her hands behind her back. A second man, whom MS identified as Steven Bard, entered the room holding a gun and asked her about the drugs. The men pulled a pillowcase over her head.

When Threlkeld returned to the home, he was assaulted by the intruders. Later, a third man entered the bedroom where MS was tied up and turned off the lights. Although MS peeked from under the pillowcase, she was unable to identify that man. She testified that he touched her buttocks, pulled her pants and underwear off, and penetrated her vagina with his penis. She kept telling him "no" and asked him to stop, but he did not. She described him covering her head with a pillow, putting his finger in her vagina, and grabbing her neck so it felt like she would choke. When one of the other men asked if her assailant was just going to "do it to her raw," he responded, "No, I do a condom." He told MS that he would be "done in a second" and ejaculated. MS thought that the rapist looked for the condom, but was unable to find it.

After the rape, the intruders continued to ransack the house before forcibly removing Brown and Threlkeld from the house. Brown and Threlkeld were shot dead. Their bodies were discovered a day later in Brown's vehicle.

After the intruders left with Brown and Threlkeld, MS was able to get free of her bindings. She was eventually able to call the police from a relative's house. The police collected evidence from the bedroom, including a used condom. A sexual assault nurse examined MS. During her examination, she observed fresh bleeding that was consistent with a sexual assault, and she collected DNA swabs from MS's vagina. Smith's DNA matched the DNA obtained from MS during the sexual assault examination and from the condom found in the bedroom where the assault took place.

In 2008, following a jury trial, Smith was convicted of two counts of first-degree murder, MCL 750.316(1)(a) and (b), two counts of assault with intent to rob while armed, MCL 750.89, one count of first-degree criminal sexual conduct, MCL 750.520b(1)(c), one count of conspiracy to commit armed robbery, MCL 750.157a, one count of first-degree home invasion, MCL 750.110a(2), and two counts of unlawful imprisonment, MCL 750.349b. Smith filed a claim of appeal as of right, and we affirmed his convictions and sentences.[2]

In March 2012, Smith moved for relief from judgment. He amended his motion in 2013 and again in 2015. Smith argued that his trial lawyer provided ineffective assistance by failing to investigate and call known and available witnesses; that the prosecution had withheld exculpatory information in violation of *Brady*; that the prosecution committed misconduct by not correcting false testimony; that the state failed to preserve DNA evidence; that there was new evidence of innocence in the form of impeachment evidence against one witness and a prior inconsistent statement by another witness; and that Smith's appellate lawyer had provided ineffective assistance. The trial court denied Smith's motion for relief from judgment. Smith applied for

---

[2] *People v Smith,* unpublished per curiam opinion of the Court of Appeals, issued July 8, 2010 (Docket Nos. 288595, 288622, and 288626); unpub op at 2.

leave to appeal that determination, but this Court denied his application.[3]  Smith then applied for leave to appeal in our Supreme Court.  That application was also denied.[4]

Thereafter, Smith filed a petition for habeas corpus relief in the United States District Court for the Eastern District of Michigan.  Smith raised the following grounds for relief: (1) ineffective assistance by both his trial and appellate lawyers; (2) that the state intentionally suppressed material exculpatory evidence in violation of *Brady*, (3) that the state presented false testimony and failed to correct testimony during trial; (4) that the state failed to preserve exculpatory DNA evidence in violation of the Fourteenth Amendment; and (5) that he had new evidence and witnesses supporting that he is actually innocent of the crimes for which he was convicted.  The federal district court considered his petition, rejected his arguments, and denied relief.[5]  He appealed the denial of his petition for habeas corpus relief to the United States Court of Appeals for the Sixth Circuit, which also denied him relief.[6]

Subsequently, nearly fourteen years after being convicted, Smith filed a successive motion for relief from judgment, arguing that he is entitled to a new trial based on an affidavit from Reich that time-since-intercourse evidence is "junk science" and evidence that the prosecution did not disclose exculpatory evidence that could have been used to impeach Helton.  As noted above, the trial court agreed with Smith and granted his successive motion for relief from judgment.

## II.  RELIEF FROM JUDGMENT

### A.  STANDARD OF REVIEW

The prosecution argues that the trial court abused its discretion by granting Smith's successive motion for relief from judgment.  This Court reviews for an abuse of discretion a trial court's grant of relief from judgment.  *People v McSwain*, 259 Mich App 654, 681; 676 NW2d 236 (2003).  Review of the court's factual findings is for clear error.  *Id.*

### B.  ANALYSIS

#### 1.  NEWLY DISCOVERED EVIDENCE

"[A] trial court many not grant relief to a defendant if the motion [for relief from judgment] alleges grounds for relief that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018); MCR 6.508(D)(3).  Additionally,

---

[3] *People v Smith*, unpublished order of the Court of Appeals, entered July 25, 2016 (Docket No. 331547).

[4] *People v Smith*, 501 Mich 907 (2017).

[5] *Smith v Rewerts*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued September 27, 2018 (Case No. 17-CV-13614).

[6] *Smith v Rewerts*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued January 6, 2020 (Case No. 19-1421).

relief may only be granted on a successive motion for relief from judgment if there is "a claim of new evidence that was not discovered before the first such motion." MCR 6.502(G)(2). Generally, courts are reluctant to grant new trials on the basis of newly discovered evidence. *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012). "This policy is consistent with requiring parties to use care, diligence, and valiance in securing and presenting evidence." *Id*. (quotation marks and citation omitted).

Our Supreme Court has articulated a four-part test to determine when newly discovered evidence will warrant a new trial. *Cress*, 468 Mich at 692. The defendant bears the burden of establishing: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Id*. (quotation marks and citation omitted).

The trial court determined that Reich's opinion that the time-since-intercourse testimony was "junk science" and was "fraudulent" was newly discovered evidence that warranted a new trial under *Cress*. On appeal, the prosecution argues that Reich's opinion is not newly discovered evidence and that, even if it is, a different result is not probable on retrial.

We first address whether Reich's testimony was newly discovered evidence. In *People v Rao*, 491 Mich 271, 283-284; 815 NW2d 105 (2012), our Supreme Court explained that newly discovered evidence is evidence that was "unknown to the defendant or his counsel at the time of trial." Here, the trial court found that Reich's opinion was unknown to Smith and his lawyer at the time of trial. That does not end our inquiry, however. MCR 6.502(G)(2)(b) provides that a successive motion for relief from judgment may be based upon "a claim of new evidence that was *not* discovered before the first such motion was filed." (Emphasis added). In turn, MCR 6.502(G)(3) expressly states that new evidence includes "*new* scientific evidence." (Emphasis added). The court rule states that new scientific evidence:

> includes, but is not limited to, shifts in science entailing changes:
>
> > (a) in a field of scientific knowledge, including shifts in scientific consensus;
> >
> > (b) in a testifying expert's own scientific knowledge and opinions, or
> >
> > (c) in a scientific method on which the relevant scientific evidence at trial was based.

In this case, there have been no shifts in the science supporting or refuting the time-since-intercourse evidence. Reich's affidavit indicates that at the time of Smith's trial in 2008, time-since-intercourse evidence was already based upon "junk science." Thus, the information to refute the prosecution's time-since-intercourse testimony existed in its current form at the time of Smith's trial. As a result, the only difference between the time of trial and Smith's motion for relief from judgment is his retention of an expert witness who has opined that, based upon the facts existing at the time of trial, the time-since-intercourse evidence is junk science. The argument is, therefore, nothing more than an argument that the materiality of the evidence is newly discovered. Because

the evidence itself, not merely its materiality, must be newly discovered, we conclude that the trial court erred by finding that Reich's opinion was newly discovered evidence. See *People v Clark*, 363 Mich 643, 647; 110 NW2d 638 (1961) ("[I]t must be shown that the evidence itself, not merely its materiality, was newly discovered[.]").

Moreover, even if the evidence could be considered newly discovered, the defense cannot satisfy the third element of *Cress*. That element requires a finding that, "using reasonable diligence, the [defendant] could not have discovered and produced the evidence at trial." *Cress*, 468 Mich at 692. "What constitutes reasonable diligence in producing evidence at trial depends on the circumstances of the case." *Rao*, 491 Mich at 283-284.

The trial court concluded that this element was satisfied because if Smith had requested funding for a second DNA expert to proffer an opinion regarding time-since-intercourse evidence, it would have denied the request. Yet, there is nothing on the record suggesting that a second expert was, in fact, necessary. The defense engaged a DNA expert who opined that the DNA analysis had been properly conducted. The record does not show what, if any, opinion the defense expert had—at the time of trial—on the time-since-intercourse evidence. The trial court assumed that a second expert would be necessary. However, because the burden is on Smith to prove that he could not discover and produce the evidence at trial, the fact that the record is silent as to (1) whether he asked his expert questions related to time-since-intercourse and (2) what answers his expert would have given, it is equally likely that he could have discovered the problems with time-since-intercourse evidence prior to trial. On this record, Smith cannot establish that he could not have *discovered* and produced the evidence at trial. Accordingly, he cannot satisfy the third element of *Cress*.

Finally, we address whether the trial court erred by finding that Reich's opinion evidence makes a different result probable on retrial. The new evidence from Reich suggested that Helton's and Jackson's opinions regarding time-since-intercourse had "no scientific foundation." Reich averred that "[a]ny suggestion that such a time frame could be estimated, guessed, calculated, or defined from the observation of submitted forensic evidence (swabs or stains on fabric) is pure junk science, or put another way, fraudulent." Reich's opinion evidence was impeachment evidence. "[N]ewly discovered impeachment evidence ordinarily will not justify the grant of a new trial." *Grissom*, 492 Mich at 317-318. "It will be the rare case in which (1) the necessary exculpatory connection exists between the heart of the witness's testimony at trial and the new impeachment evidence and (2) a different result is probable on retrial." *Id*. at 318. "Newly discovered impeachment evidence concerning immaterial or collateral matters cannot satisfy *Cress*." *Id*. at 321.

MS testified that she could not identify the man who raped her because her head was covered by a pillowcase. Accordingly, the only evidence identifying her assailant was the DNA evidence collected from her and from the condom recovered from the bedroom where she was raped. According to Helton's expert testimony, Smith's DNA was present in the samples collected from MS and the samples collected from the condom. Smith did not dispute that fact at trial, nor does Reich's criticism of the time-since-intercourse evidence suggest that Helton's DNA analysis was erroneous. Rather, at trial, Smith relied upon Helton's DNA analysis, which, in addition to identifying his DNA in MS and on the condom, identified an unknown male contributor on the sample collected from the condom. Smith's defense was that he had consensual sexual relations

with MS prior to her being raped by the unknown contributor to the sample collected from the condom. MS, however, testified that she had never had a relationship with Smith and that she did not have consensual sex with him. He presented no testimony at trial to refute her testimony.

The time-since-intercourse evidence corroborated the prosecution's theory of the case. Jackson opined that, based on its quantity and quality, the sperm in the samples collected from MS and the condom had been deposited less than 12 hours, or possibly up to 24 hours, before the sample was collected. Similarly, Helton testified that the sperm had been deposited less than 12 hours before the samples were collected, but that they could have been deposited from up to 18 hours before collection. She added that, although some literature suggested that sperm cells could survive in the vaginal canal for up to 72 hours, it could not survive for that long in the amounts that she detected on the samples. It is undisputed that MS was raped within that timeframe. However, at trial, the defense was also that the allegedly consensual sex between Smith and MS also occurred within that same timeframe. Smith also agreed that someone else had raped MS in that same timeframe. Thus, the defense's theory was also corroborated by the time-since-intercourse testimony. As a result, even with Reich's opinion evidence impeaching the time-since-intercourse evidence, a different result would not be probable on retrial. Stated differently, there is not an exculpatory connection between Reich's testimony and the testimony presented at trial. With or without the time-since-intercourse testimony, the jury heard unrefuted testimony that MS was sexually assaulted, DNA samples were collected from her and from a condom located in the bedroom, Smith's DNA was identified to be present in the samples from MS and from the condom, and MS denied having consensual sexual relations with Smith. Reich's testimony that the time-since-intercourse testimony was junk science, therefore, would not have made a different result probable on retrial.

We recognize that the trial court was also obliged to consider other evidence that might be introduced on retrial. As we will discuss further below, the defense could attempt to impeach Helton's credibility with newly discovered evidence about her having completed her supervisor's proficiency testing in his place. Yet, the defense maintained that Smith had had consensual sex with MS and, therefore, it did not dispute Helton's conclusions that Smith's DNA was recovered from MS and the condom recovered from the scene. In fact, the defense relied on Helton's testimony that there were three contributors to the sample. The defense argued that MS and Smith were contributors as a result of consensual sex, and that the unidentified donor was the assailant. Impeaching Helton would be counterproductive when relying on her testimony to suggest that someone else was the assailant.[7]

Other avenues for cross-examination of witnesses, including MS and Johnny Hodges, were also unlikely to make a different result probable on retrial, individually or collectively. The trial court noted that, after trial, Hodges's credibility had been undercut with evidence that he perjured himself when testifying at another criminal trial. Therefore, if he were called to testify again about seeing Smith with one of his codefendants several times, his credibility could be impeached. But

---

[7] For this same reason, Smith's contention that there was still more newly discovered evidence from a prior case that could have been used to impeach Helton, which the trial court did not consider, would not have made a difference on retrial.

even if Hodges did not testify, or were effectively impeached, other evidence nevertheless would tie Smith to the victims, including testimony from Threlkeld's mother, who recalled Smith looking for her son in April 2007.

The trial court also noted that, on retrial, Smith's lawyer could cross-examine MS further about her conversation with a former boyfriend, who was in jail, during which the boyfriend accused a man not involved with the case of being the perpetrator of the sexual assault. The court concluded that such cross-examination was speculative. We agree that any additional cross-examination would not have been material to the defense, because MS's former boyfriend was not at the scene to identify the assailant, and MS consistently maintained at trial, and on the phone call, that she did not see the perpetrator.

In sum, the trial court clearly erred by finding that Smith was entitled to a new trial on the basis of the newly discovered evidence from Reich. The evidence's materiality, not the evidence itself, was newly discovered. Moreover, Smith failed to establish that he could not, using reasonable diligence, have discovered and produced the evidence for trial. Finally, although newly discovered evidence can establish good cause for failing to bring claims in a prior motion, MCR 6.508(D)(3), Smith failed to establish actual prejudice. Contrary to the trial court's conclusion, Smith would not have had a reasonably likely chance of acquittal with the benefit of Reich's expertise. See MCR 6.508(D)(3)(b)(i)(A). Moreover, Smith was allowed one DNA expert at trial, who ultimately did not challenge the opinions of the prosecution experts. Because additional expert testimony about the timing of the allegedly consensual sex would have been of questionable relevance, and possibly harmful, to the defense, Smith could not establish that the absence of expert testimony from Reich "was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." MCR 6.508(D)(3)(b)(iii). For these reasons, the trial court erred when it granted relief from judgment on the basis of Reich's proposed expert testimony.

## 2. *BRADY* VIOLATION

The prosecution next argues that the trial court erred by concluding that Smith was entitled to relief from judgment over a *Brady* violation, on the ground that the prosecution failed to turn over information about Helton's proficiency testing in place of her supervisor and the investigation that followed. To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

The prosecution concedes the first prong of the *Brady* test, noting that, even though the assistant prosecutor handling the case was not aware of the proficiency-testing issue, another prosecuting attorney in the office was aware of the information.

The prosecution argues, however, that the proficiency-testing issue was not favorable to the defense. The record shows that, pursuant to her supervisor's directions, Helton performed her supervisor's proficiency testing in 2003 and 2004 and signed his initials to the testing results. Helton's actions were inconsistent with policies requiring transparency regarding collaborative participation on tests. Although human resources recommended termination, Helton was not disciplined. Rather, the proceedings involving falsification of a report and the failure to report it were

"set aside." The Forensic Science Division Commander wrote, "As a result of our investigation, we are confident Ms. Helton's tests were completed on her own. Any assistance she provided to [her supervisor] was as a result of inappropriate directives or misleading and false information given to her by her supervisor . . . ." The prosecution places significant weight on Helton's having acted upon her supervisor's directives and receiving no discipline in the matter. But Helton's decision to sign her supervisor's initials is an act that bears on her credibility. "Evidence is favorable to the defense when it is either exculpatory or impeaching." *People v Abcumby-Blair*, 335 Mich App 210, 217-218; 966 NW2d 437, 442-443 (2020) (quotation marks and citations omitted).

The third element of a *Brady* violation, however, requires a showing that the suppressed evidence was material.

> To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Chenault*, 495 Mich at 142. (quotation marks and citations omitted).]

Here, the suppressed proficiency-testing evidence concerned an isolated occurrence from years before trial. The evidence involved Helton's honesty and susceptibility to being compromised in the context of her department's proficiency testing, not the processing of evidence in a criminal case. Moreover, Helton acted only upon a supervisor's direction, and there was no evidence of similar pressure from any authority figure against Helton in Smith's case. Additionally, Smith's own expert opined that Helton's methodology was sound. Finally, Helton's conclusion that Smith's DNA was recovered from the sperm samples was consistent with his defense that he had had consensual sex with MS. As Smith's lawyer testified during a posttrial evidentiary hearing, his focus was not to impeach the DNA experts. Rather, he relied on their testimony to argue that there were three DNA contributors, including MS, Smith, and the unidentified assailant.

Other aspects that could change on retrial, such as testimony that might be elicited from Hodges and MS, would not bring about a different result. Moreover, the missed opportunity for impeaching Helton and Jackson regarding their time-since-intercourse opinions does little to undermine confidence in the verdict, because the question whether MS and Smith had consensual sex—not precisely when—was pivotal to the defense. These facts, on their own or combined, would not make a different result probable on retrial. Therefore, the trial court clearly erred when it concluded that the proficiency-testing evidence was material. Absent materiality, no *Brady* violation occurred.

Because there is no *Brady* violation, Smith cannot establish the good cause and actual prejudice required for his motion for relief from judgment. See MCR 6.508(D)(3)(b)(i)(A). Moreover, because no *Brady* violation occurred, and the proficiency-testing impeachment evidence was so disconnected from the case at hand, Smith could not establish an "irregularity . . . so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." MCR 6.508(D)(3)(b)(iii).[8] For these reasons, we conclude that the trial court erred by granting relief from judgment on the basis of Helton's performance of proficiency testing for her supervisor.[9]

Reversed. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Michael J. Kelly
/s/ Michael J. Riordan

---

[8] The prosecution argues that the trial court did not adequately explain its finding of actual prejudice under MCR 6.508(D)(3)(b)(iii), which it characterizes as structural error. Defendant responds that the prosecutor's arguments related to MCR 6.508(D)(3)(b)(iii) are not properly before this Court because they were not raised in the application for leave to appeal. We acknowledge that the prosecution did not cite MCR 6.508(D)(3)(b)(iii) in the application for leave to appeal, and argued that the "easiest way" to resolve the arguments on appeal was under MCR 6.508(D)(3)(b)(i)(A). But the question whether relief from judgment was an abuse of discretion was addressed more generally throughout. Accordingly, we will consider the argument.

[9] In light of our conclusion that the trial court erred by granting the motion for relief from judgment, we decline to address the prosecution's remaining argument.

-9-